UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

VINCENT PEPE,

                Petitioner,

        V.

JAMES WALSH,

                Respondent.

_____

**REPORT AND
RECOMMENDATION**

04-CV-835
GTS/VEB

## I. INTRODUCTION

Vincent Pepe ("Petitioner"), by and through his counsel, commenced this action seeking habeas corpus relief under 28 U.S.C. § 2254. Petitioner is an inmate at the Sullivan Correctional Facility. In 1995, he was convicted after trial in a New York State court of four counts of Second Degree Murder, one count of Third Degree Criminal Possession of a Weapon, one count of Second Degree Criminal Possession of a Weapon, two counts of First Degree Robbery and Third Degree Arson and sentenced to a term of imprisonment. Petitioner contends his conviction was imposed in violation of his federal constitutional rights and should be vacated.

This matter was referred to the undersigned by the Honorable Norman A. Mordue, Chief United States District Judge, for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(A) and (B). (Docket No. 19).

## II. BACKGROUND

**A.    Facts**

The background and procedural history of this matter are relatively complex. Numerous factual and legal issues are subject to sharp disagreement among the parties. The facts and proceedings will be discussed during the course of this Report and Recommendation as they relate to specific claims and issues in controversy.

The following brief summary of the factual background is derived from the state court records: On October 7, 1993, John Zajac and Charles Brewer were shot and killed at the North Utica Cleaners, a dry cleaning establishment owned by Petitioner's parents and located in Utica, New York.  (TT  at 487, 497-500, 958-973).[1]  The victims' bodies were placed in the trunk of Zajac's car and driven to the parking lot of a nearby shopping mall. (TT at 509-517).  Gasoline was poured into the vehicle and ignited.  (TT at 189-195, 513-517).   The Utica Police and Fire Departments responded to the fire and began an investigation.  (TT at 189-195, 211-213, 222-223, 234, 242).

The following day, Petitioner asked Dominic Crocilla, his boss and friend, to help him dispose of various blood-stained items. (TT at 1114).  When Crocilla inquired as to what had happened, Petitioner said "You don't want to know right now." (TT at 1114).  Petitioner and Crocilla traveled to Crocilla's house and burned bloody clothes and cloths in an open pit located in the rear of Crocilla's property. (TT at 1118-1123).  Later, Petitioner told Crocilla that he and an associate, David Benner, had "a bad drug deal" at the North Utica Cleaners. (T at 1127).  Petitioner said that Benner had beaten one of the victims and

_____

[1]References preceded by "TT" are to the transcript pages of Petitioner's trial proceedings.

2

repeated that Crocilla "didn't want to know" who shot the victims. (T at 1128-29).  Petitioner did, however, tell Crocilla that he had stepped on one victim's neck. (T at 1130).

During the course of their investigation, the Utica Police Department learned that the burned vehicle belonged to Carol Zajac, John Zajac's mother.  Mrs. Zajac informed police that her son worked at a local bar with Brewer (the other victim).  (TT at 160-166, 887-889). The police learned that Zajac and Brewer had been seen with Petitioner (who was 19 at the time) and Benner (who was 21).  (TT at 891-894).  The police interviewed Petitioner and Benner.  Both denied any involvement in the murders.  No arrests were made, but the investigation continued.

On or about March 2, 1994, Benner provided a statement to the police implicating Petitioner in the murders of Zajac and Brewer.  (TT at 917-918).  On March 11, 1994, Benner, wearing a wire and acting as an undercover agent of the police, had a conversation with Petitioner, during which Petitioner made incriminating statements about the murders. (TT at 545-55). Petitioner was taken into custody on March 15, 1994, given his Miranda rights, and interrogated.  He admitted that Zajac and Brewer were present at the dry cleaners under the pretense of completing a marijuana purchase, admitted helping to burn the bodies, and acknowledged possessing a gun at the murder scene, but suggested he was not the shooter.  (TT at 930-935, 1012, 1016, 1020).  Petitioner was arrested shortly after making his statement.

On March 18, 1994, an Oneida County Grand Jury returned Indictment Number 94-101, charging Petitioner with two counts of Murder in the Second Degree, in violation of New York Penal Law ("NYPL") §125.25(1); two counts of Murder in the Second Degree, in violation of NYPL §125.25(2); two counts of Murder in the Second Degree, in violation

3

of NYPL § 125.25(3) (felony murder); one count of Criminal Possession of a Weapon in the Third Degree, in violation of NYPL § 265.02(4); one count of Robbery in the First Degree, in violation of NYPL § 160.15(2); and one count of Arson in the First Degree,[2] in violation of NYPL § 150.20(1).

## B.    State Trial Court Proceedings

The Honorable Nathaniel Merrell, Oneida County Court Judge, presided over Petitioner's trial, which began on January 30, 1995.  Petitioner was represented at trial by Kenneth P. Ray, Esq.  On March 9, 1995, the jury found Petitioner guilty on all charges.[3] (TT at 1920-1922).

On April 25, 1995, Petitioner was sentenced to concurrent indeterminate sentences of 25 years to life for two of his murder convictions to run consecutively with concurrent sentences of 25 years to life for his other two murder convictions.  (TT at 2117-2118). For his conviction of Criminal Possession of Weapon in the Second Degree, Petitioner received an indeterminate sentence of five to 15 years, and for his conviction of Criminal Possession of a Weapon in the Third Degree, Petitioner was sentenced to two and one third years to seven years imprisonment.  (TT at 2118-2119).  For each of his two convictions of Robbery in the First Degree, Petitioner received an indeterminate sentence of eight and one third years to 25 years.  (TT at 2119).  For his conviction for Arson in the Third Degree, Petitioner received a sentence of five to 15 years.  (TT at 2120).  Petitioner's other sentences were to run concurrently with the two murder sentences.  (TT at 2120).

---

[2]At the end of the prosecution's direct case, the trial court amended the indictment to allege Arson in the Third Degree, in violation of NYPL § 150.10, instead of Arson in the First Degree.

[3]The two counts of Murder in the Second Degree for Depraved Indifference were not presented to the jury.

4

Therefore, Petitioner's total aggregate sentence was fifty (50) years to life.  (TT at 2121-2122).

## C.   State Appellate Proceedings

Petitioner, represented by John Cirando, Esq., appealed his conviction to the Appellate Division, Fourth Department, of the New York State Supreme Court.  Petitioner asserted twelve (12) arguments in support of his direct appeal: (1) he was denied the timely disclosure of Brady material; (2) he was denied effective assistance of counsel due to conflicts of interest; (3) he was denied the opportunity to fully cross-examine prosecution witnesses; (4) the trial court erred in allowing improper and prejudicial rebuttal evidence; (5) the trial court improperly admitted his statements and oral admissions; (6) the accomplice testimony was uncorroborated; (7) there was prosecutorial misconduct; (8) the prosecution failed to disclose Rosario material; (9) the trial court made improper pre-trial rulings; (10) a recorded conversation between Petitioner and Benner was improperly admitted; (11) certain exhibits were improperly admitted into evidence; and (12) the sentences imposed were harsh and excessive.

In a decision issued on March 19, 1999, the Appellate Division unanimously affirmed Petitioner's conviction and sentence.  People v. Pepe, 689 N.Y.S.2d 310 (4th Dep't 1999).  Petitioner's application for leave to appeal to the Court of Appeals was denied on August 13, 1999.  People v. Pepe, 93 N.Y.2d 1024 (1999).

On October 16, 2000, Petitioner moved pursuant to New York Criminal Procedure Law § 440.10 to vacate his conviction.  (Exhibit G).[4]  Petitioner asserted four grounds for

---

[4]References preceded by "Exhibit" are to documents provided to this Court as attachments to Respondent's Declaration in Opposition to the Petition.

relief: (1) conflict of interests adversely impacted his defense; (2) the prosecution withheld Brady and Rosario material; (3) trial counsel failed to investigate and present exculpatory forensic evidence that would have revealed David Benner's inconsistent description of the crime scene; and (4) Petitioner's right to counsel was violated when a state agent conducted an illicit jailhouse interrogation.  (Id.).

On November 26, 2001, the Honorable Joseph D. McGuire, Acting Oneida County Court Judge, denied Petitioner's motion.  (Exhibit H).  On May 17, 2004, the Appellate Division, Fourth Department denied Petitioner permission to appeal.  (Exhibit J).

On March 28, 2003, Petitioner made a second motion pursuant to CPL § 440.10 on the grounds that the prosecution suppressed newly discovered evidence in the form of a police "lead sheet"[5] and the arrest report for accomplice David Benner. (Exhibit K).

On August 22, 2003, the Honorable James McCarthy, Oswego County Court Judge, denied the motion.  (Exhibit L). On October 27, 2003, the Appellate Division, Fourth Department denied Petitioner permission to appeal.  (Exhibit M).

Thereafter, Petitioner moved for a writ of error coram nobis.  The Appellate Division, Fourth Department denied the writ on December 31, 2003.  People v. Pepe, 2 A.D.3d 1491 (4th Dep't 2003).  Leave to appeal was denied by the Court of Appeals on March 18, 2004. People v. Pepe, 2 N.Y.S.3d 744 (2004).

## D.  Federal Habeas Corpus Proceedings

Petitioner, represented by Barry Fallick, Esq., commenced this action on July 19, 2004, by filing a Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254.

---

[5]A "lead sheet" is used by police investigators to record the steps they have taken in an investigation.

(Docket No. 1).  The Petition asserts three grounds for relief: (1) Petitioner was denied the effective assistance of counsel due to a conflict of interest involving the simultaneous and subsequent representation of prosecution witnesses by Attorneys Joseph Hobika, Jr. and George Farber Aney; (2) the prosecution violated their <u>Brady</u> disclosure obligations by failing to turn over exculpatory and impeachment evidence; and (3) Petitioner was denied the effective assistance of counsel because his trial counsel failed to procure expert forensic testimony.

Petitioner's counsel filed a memorandum of law in support of the Petition. (Docket No. 5).  On January 21, 2005, Respondent, by and through the Attorney General of the State of New York, filed an affidavit and memorandum of law in opposition to the Petition. (Docket Nos. 14 & 15).  Petitioner's counsel filed a reply memorandum of law on March 10, 2005. (Docket No. 16).

On June 13, 2008, this Court issued a Memorandum-Decision and Order finding that an evidentiary hearing was necessary with respect to Petitioner's first ineffective assistance claim pursuant to <u>Sparman v. Edwards</u>, 154 F.3d 51, 52 (2d Cir.1998). (Docket No. 32). This Court presided over a four (4) day <u>Sparman</u> hearing in Syracuse, New York, beginning on September 15, 2008, and ending on September 18, 2008.  Counsel for the parties thereafter submitted written closing statements (Docket Nos. 81, 86, 91) and this Court reserved decision.  In 2011, at the direction of this Court, the parties submitted memoranda of law concerning the impact of the Supreme Court's decision in <u>Cullen v. Pinholster</u>, 131 S. Ct. 1388, 179 L. Ed. 2d. 557 (2011). (Docket Nos. 92, 96, 98, 100).

For the reasons that follow, the Court recommends that the Petition be denied.

## III. DISCUSSION

**A.    Federal Habeas Corpus Standard**

Federal habeas corpus review of a state court conviction is governed by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  Under AEDPA, federal courts must give substantial deference to a state court determination that has adjudicated a federal constitutional claim "on the merits."  28 U.S.C. § 2254(d); Sellan v. Kuhlman, 261 F.3d 303, 309-10 (2d Cir. 2001).  The Second Circuit has stated that an "adjudication on the merits" is a "substantive, rather than a procedural, resolution of a federal claim." Sellan, 261 F.3d at 313 (quotation omitted).  The Second Circuit has also held that even a one-word denial of a petitioner's claim is sufficient to constitute an "adjudication on the merits" for purposes of AEDPA.  Id. at 312-313.

Specifically, AEDPA requires that where a state court has adjudicated the merits of a Petitioner's federal claim, habeas corpus relief may not be granted unless the state court's adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

While both AEDPA and its predecessor statute recognize that a presumption of correctness shall apply to state court findings of fact, Whitaker v. Meachum, 123 F.3d 714, 715 n. 1 (2d Cir. 1997), AEDPA also requires a Petitioner to rebut that presumption by

"clear and convincing evidence."  28 U.S.C. § 2254(e)(1); LanFranco v. Murray, 313 F.3d 112, 117 (2d Cir. 2002).  A presumption of correctness applies to findings by both state trial and appellate courts.  Galarza v. Keane, 252 F.3d 630, 635 (2d Cir. 2001); Whitaker, 123 F.3d at 715 n.1.

In Williams v. Taylor, 529 U.S. 362, 413 (2000), the Supreme Court defined the phrases "contrary to" and "unreasonable application of" clearly established federal law.  A state court decision is "contrary to clearly established federal law . . . if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Court] has on a set of materially indistinguishable facts."  Id.

A state court decision involves "an unreasonable application of" Supreme Court case law if it "identifies the correct governing legal principle from [the Court's] decisions but unreasonably applies that principle to the particular facts of [a] prisoner's case."  Id.

Under this standard, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." Id. at 411.  In order to grant the writ there must be "some increment of incorrectness beyond error," although "the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." Francis S. v. Stone, 221 F.3d 100, 111 (2d Cir. 2000) (internal quotation marks omitted).

**B.     Ground One - Ineffective Assistance of Counsel (Conflict of Interest)**

In his first claim for habeas relief, Petitioner contends he was denied the effective assistance of counsel in violation of his rights under the Sixth Amendment because of conflicts of interest involving Attorneys Joseph Hobika Jr. and George Farber Aney.  This claim actually contains two (2) distinct arguments.

First, Petitioner asserts that he was represented by Attorneys Hobika and Aney from the initial police investigation in October 1993 until his March 22,1994 arraignment on the grand jury indictment.  Petitioner argues that Aney and Hobika were operating under a conflict of interest during this time period, as they were simultaneously representing Dominic Crocilla and Matthew Cuda, other potential targets of the police investigation and government witnesses before the grand jury.

Petitioner claims these conflicts of interest tainted the grand jury and trial proceedings, causing the allegedly erroneous admission of prejudicial evidence. Petitioner further asserts that Aney and Hobika failed to explore the possibility of a pre-indictment plea agreement, never advised him of his right to testify before the grand jury, and may have improperly revealed confidential information obtained during the course of their representation.

Second, Petitioner argues that Attorney Kenneth Ray, his trial counsel, was ineffective for failing to adequately address the Hobika/Aney conflict of interest issue during the pre-trial and trial proceedings. Although not expressly designated as a separate claim in the Petition, it is clear that Petitioner seeks relief on this additional and alternative ground. This Court will address each of Petitioner's ineffective assistance arguments in

10

turn.

**1.     Ineffective Assistance/Conflict of Interest (Hobika & Aney)**

It is well-settled that "[t]he right to counsel under the Sixth Amendment entails 'a correlative right to representation that is free from conflicts of interest.'" United States v. Levy, 25 F.3d 146, 152 (2d Cir.1994) (quoting Wood v. Georgia, 450 U.S. 261, 271, 101 S.Ct. 1097, 67 L.Ed.2d 220 (1981)); accord Armienti v. United States, 313 F.3d 807, 811 (2d Cir.2002).

Generally, the guidepost for determining whether a criminal defendant's counsel was unconstitutionally ineffective is the two-part test set forth in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), which constitutes clearly established law on this point.   The Strickland test requires the petitioner to show (1) that counsel's performance was deficient and (2) that he or she was prejudiced by the deficient performance.

However, with regard to ineffective assistance claims based upon conflicts of interest, a more lenient standard will apply.  Specifically, "[a] defendant will have suffered ineffective assistance of counsel in violation of his Sixth Amendment rights if his attorney has a 'per se' conflict, a potential conflict of interest that results in prejudice to the defendant, or an actual conflict of interest that adversely affects the attorney's performance." Armienti, 313 F.3d at 811 (citing, *inter alia*, Levy, 25 F.3d at 152).

**a.     State Court Determination**

On direct appeal, Petitioner, through his appellate counsel, argued that he was denied the effective assistance of counsel because Attorneys Aney and Hobika were

operating under an actual conflict of interest during the pre-indictment and grand jury phases of the case.  The Appellate Division, Fourth Department denied Petitioner's claim, finding that:

> Even assuming, arguendo, that the same attorneys represented defendant and some prosecution witnesses during the Grand Jury investigation, we conclude that, because defendant was represented by different counsel at his arraignment and through the completion of the trial, he failed to establish that the continued representation of those prosecution witnesses by his former attorneys bore a substantial relation to the conduct of his defense.

People v. Pepe, 689 N.Y.S.2d 310, 313 (4th Dep't 1999).

As noted above, the Court of Appeals denied Petitioner's request for leave to appeal from the Appellate Division's decision.  As such, the Appellate Division's decision is the last reasoned state court ruling.

Thereafter, Petitioner, through counsel, filed a motion pursuant to the New York Criminal Procedure Law (commonly referred to as a "440 motion"), arguing *inter alia* that Hobika and Aney were operating under a conflict of interest, which denied him the effective assistance of counsel.  Petitioner submitted several affidavits in support of his motion and requested an evidentiary hearing. (Exhibit G).

In a Decision & Order issued on November 26, 2001, Acting County Court Judge Joseph D. McGuire denied Petitioner's 440 motion.  (Exhibit H).  Judge McGuire noted that the "issue of conflicting representation was raised by appellate counsel before the Appellate Division." (Id., at p. 3).  Accordingly, Judge McGuire concluded that he was barred from reconsidering the question pursuant to CPL § 440.20 (2), which prevents the rehearing of issues previously raised and decided on the merits via direct appeal. (Id., at p. 4).

12

Petitioner sought leave to appeal from Judge McGuire's Order, but his request was denied on July 2, 2002. (Exhibits I & J).

### b.  Factual Background/Contentions

Petitioner contends that Hobika and Aney acted as his attorneys from the outset of the police investigation.  He further alleges that he shared privileged information concerning the case with those attorneys during the course of this representation.  According to Petitioner, during some or all of this time, Hobika and Aney were also representing Dominic Crocilla and Matthew Cuda in connection with the same murder investigation.  (Because Crocilla and Cuda helped Petitioner dispose of evidence related to the murders, they were potential suspects).  Petitioner also suggests that one or both of the attorneys agreed to accept legal fees from Crocilla on Petitioner's behalf.

The following facts are undisputed: On March 15, 1994, Petitioner was arraigned in the Utica City Court on two counts of second degree murder.  At that hearing, Petitioner advised the court that he was being represented by Attorneys Aney and Hobika. (PE # 8, at 2, 4).[6]  He explained that Aney was out of town and indicated that he would attempt to contact Hobika. (PE #8, at 2, 4).  At that point, a court clerk advised that she believed Hobika had called the court, although she had not spoken with him. (PE #8, at 5).

Attorney Aney appeared on Petitioner's behalf at a court hearing in Utica City Court the next day, March 16, 1994 (PE # 9).  Aney indicated that he would be representing Petitioner and intended to make a bail application shortly. (PE #9, at p. 11).  Aney visited Petitioner in jail later than evening. (Court Exhibit #1).  Petitioner was indicted by the grand

---

[6]Citations to "PE" refer to exhibits offered by Petitioner at the <u>Sparman</u> hearing.  The above-referenced transcript was also part of the state court record.

jury on March 18, 1994.

In support of his 440 motion, Petitioner submitted affidavits from his mother (Santa Pepe), father (Joseph Pepe), and uncle (Joseph Papandrea), stating that they were present at a meeting with Aney and Crocilla, during which Crocilla agreed to pay Petitioner's legal fees. (Exhibit G & PE # 6-7). Petitioner also provided the 440 court with an affidavit from Charles Wason, a former associate of Kenneth Ray, Petitioner's trial counsel. (Exhibit G & PE#1). Wason stated that he had two conversations with Attorney Hobika. According to Wason, during the first conversation, Hobika acknowledged representing Petitioner during the investigative stages of the case and explained that he told Petitioner to refer police questions to Aney or Hobika. Wason stated that he contacted Hobika a second time concerning his possible testimony at a suppression hearing, whereupon Hobika denied the representation and warned that, if called as a witness, his testimony "would not be to [Petitioner's] benefit."(Exhibit G & PE#1).

Petitioner contends that Aney/Hobika's dual representation of Crocilla and Cuda during the police investigation and grand jury proceedings gave rise to an actual conflict of interest. Specifically, Petitioner argues that Aney and Hobika were forced to choose between Crocilla and Cuda on the one hand (who received immunity and testified before the grand jury, thereby benefitting from early cooperation against Petitioner) and Petitioner (whose cooperation with the police at the outset would have left Crocilla and Cuda exposed to prosecution for their conduct in covering up the murders). Petitioner asserts that the dual representation conflict adversely affected Aney and Hobika's performance. In particular, Petitioner contends that Aney and Hobika failed to discuss the benefits of cooperation and never advised Petitioner of his right to testify before the grand jury. In

14

addition, Petitioner suggests the attorneys may have revealed his confidences to them and that their multiple representation tainted the suppression hearing, which caused the erroneous admission of prejudice evidence.  In addition, Petitioner suggests that Aney revealed confidences to James Pugliese, another Aney client who testified as a rebuttal witness for the prosecution.

Respondent argues that Petitioner's claims are without merit.  To that end, Respondent notes that Attorney Hobika never appeared in any legal proceeding or filed a notice of appearance on Petitioner's behalf.  Respondent argues that Petitioner's suggestion that Aney and/or Hobika shared unspecified "confidences" with prosecution witnesses is wholly speculative.  Respondent also contends that the Appellate Division's rejection of Petitioner's claim on the grounds that any pre-indictment representation by Aney and/or Hobika did not bear "a substantial relation" to the conduct of Petitioner's defense was not contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court.

### c.    Consideration of <u>Sparman</u> Evidence

After reviewing the parties' initial submissions and receiving further briefing, this Court determined that an evidentiary hearing was warranted pursuant to <u>Sparman v. Edwards</u>, 154 F.3d 51 (2d Cir. 1998). (Docket No. 32). In <u>Sparman</u>, the United States Court of Appeals for the Second Circuit held that "a district court facing the question of constitutional ineffectiveness of counsel should, except in highly unusual circumstances, offer the assertedly ineffective attorney an opportunity to be heard and to present evidence, in the form of live testimony, affidavits, or briefs." <u>Id.</u> at 52.

The <u>Sparman</u> hearing was held in Syracuse, New York, beginning on September 15,

15

2008, and ending on September 18, 2008.

While this matter was under submission, the Supreme Court rendered its decision in Cullen v. Pinholster, 131 S. Ct. 1388, 179 L.Ed. 2d 557 (2011).  In that case, the habeas petitioner was convicted of murder in state court and sentenced to death.   He unsuccessfully appealed his conviction via state court proceedings.  Id. at 1394.   After conducting an evidentiary hearing, a federal district court concluded that the petitioner's trial counsel had been unconstitutionally ineffective during the penalty phase of the trial.  The Ninth Circuit Court of Appeals considered the new evidence adduced at the district court's evidentiary hearing and concluded that the state court's decision affirming the conviction "was contrary to, or involved an unreasonable application of, clearly established Federal law," pursuant to 28 U.S.C. § 2254 (d)(1).  Id.

The Supreme Court reversed.  The Court gave careful consideration to the language of 28 U.S.C. § 2254 (d), which applies to claims that have been "adjudicated on the merits in State court proceedings," and which limits the granting of habeas relief to cases in which the state court adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Id. at 1398 (quoting 28 U.S.C. § 2254 (d)).

Interpreting the language of this subsection, the Court held that "review under § 2254 (d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." Id. at 1398.  The Court explained that "review under § 2254 (d)(1) focuses

16

on what a state court knew and did" and "measure[s]" the State-court decision against Supreme Court "precedents as of 'the time the state court renders its decision.'" Id. at 1399 (quoting Lockyer v. Andrade, 538 U.S. 63, 71-72, 123 S. Ct. 1166 (2003)). The Court found that it "would be strange to ask federal courts to analyze whether a state court's adjudication resulted in a decision that unreasonably applied federal law to facts not before the state court." Id.

Thus, the question presented in the instant case is whether and to what extent this Court may consider the evidence adduced at the Sparman hearing. Petitioner contends that this Court may consider evidence presented for the first time in the Sparman hearing, notwithstanding the Pinholster decision.

First, Petitioner contends that Pinholster is distinguishable on its facts because, unlike the petitioner in that case, Petitioner here made diligent efforts to present additional evidence to the State courts in support of his claim. There is arguable support for this assertion in Justice Sotomayor's dissenting opinion. See Pinholster, 131 S.Ct. at 1417 n. 5 ("I assume that the majority does not intend to suggest that review is limited to the state-court record when a petitioner's inability to develop the facts supporting his claim was the fault of the state court itself.")(Sotomayor, J., dissenting).

However, Justice Sotomayor's reference to the inability to develop facts during the state court proceedings was made in the context of additional facts or evidence giving rise to a "new claim." Id. Here, the question is whether this Court may consider evidence not presented to the State courts in support of a claim raised in the State courts and adjudicated by the State courts on the merits. The majority holding in Pinholster explicitly forecloses such consideration and expressly limits this Court's review to "the record that

17

was before the state court that adjudicated the claim on the merits." Id. at 1398.

Second, Petitioner argues that the Supreme Court's decision in Pinholster does not forbid the introduction of additional evidence in hearings held pursuant to the Second Circuit's Sparman decision.  As noted above, in Sparman v. Edwards, the Second Circuit held that "a district court facing the question of constitutional ineffectiveness of counsel should, except in highly unusual circumstances, offer the assertedly ineffective attorney an opportunity to be heard and to present evidence, in the form of live testimony, affidavits, or briefs." Sparman, 154 F.3d at 52.  Hearings held pursuant to the Second Circuit's decision have customarily been referred to as "Sparman hearings."

This Court finds it difficult to discern a rationale under which Sparman survives post-Pinholster with regard to ineffective assistance of counsel claims adjudicated on the merits in the State courts.   Indeed, in an unpublished summary order issued shortly after Pinholster was decided, a panel of the Second Circuit suggested that Sparman hearings are no longer permitted. Ridgeway v. Zon, No. 09-4789, 2011 WL 2357311 (2d Cir. June 15, 2011).  The panel noted that "additional information proffered before the District Court" appeared to "lend credence" to the petitioner's ineffective assistance claim. Id. at *2.  The court further indicated that it might have remanded the case to give petitioner's counsel "an opportunity to explain behavior that does not appear to have been the product of 'appropriate strategic considerations,'" but declined to do so on the grounds that the Supreme Court had "now apparently foreclosed that avenue . . . here." Id. at *2 (citing Pinholster).  At least one other circuit court has reached the same conclusion. See Pape v. Thaler, 645 F.3d 281, 288 (5th Cir. 2011)("Under Pinholster, however, the district court erred by conducting the evidentiary hearing and by relying on evidence from that hearing

18

to conclude that the state habeas court had unreasonably applied <u>Strickland</u>.").

Lastly, and most importantly, Petitioner suggests that <u>Pinholster</u> does not apply because a particular aspect of the Aney/Hobika ineffective assistance claim was not adjudicated on the merits by the State courts.  While Petitioner concedes that the Appellate Division reached adversely the merits of his claim that the Aney/Hobika conflict of interest prejudiced his defense at trial, he argues that the Appellate Division did not reach the merits of his argument that the conflict of interest prejudiced him during the pre-indictment phase.  This Court finds Petitioner's argument unavailing.

Petitioner clearly raised the alleged pre-indictment conflict on direct appeal. (Exhibit A, at p. 17-21).  The Appellate Division did not directly discuss this particular conflict.  Indeed, the court did not make an explicit finding regarding whether there was, in fact, dual representation by Aney and/or Hobika at any time.  Rather, the court simply assumed "arguendo, that the same attorneys represented [Petitioner] and some prosecution witnesses during the Grand Jury investigation" and then concluded that because Petitioner was "represented by different counsel at his arraignment and through the completion of the trial," he could not "establish that the continued representation of those prosecution witnesses by his former attorneys bore a substantial relation to the conduct of his defense." <u>People v. Pepe</u>, 689 N.Y.S. 2d 310, 313 (4th Dep't 1999).

Thus, the Appellate Division did not expressly answer (or even address) the question of whether Petitioner was prejudiced by attorney conflicts of interest during the pre-indictment phase.  As to that aspect of the ineffective assistance claim, it was not the *continued* representation of prosecution witnesses by Petitioner's *former* attorneys at issue.  With respect to the pre-indictment period, Petitioner's claim was based upon the alleged

19

*simultaneous* representation of prosecution targets by his (then) current attorneys. However, for the reasons outlined below, under well-settled Second Circuit law, this Court must conclude that the Appellate Division adjudicated this aspect of Petitioner's ineffective assistance claim on the merits, even though the state court did not specifically mention the argument, let alone provide a rationale for rejecting it.

The Appellate Division ended its decision by stating that it had reviewed Petitioner's "remaining contentions and conclude[d] that they lack[ed] merit." Id.  It is well-settled in the Second Circuit that "to qualify as an adjudication 'on the merits,' a state court decision need not mention a particular argument or explain the reasons for rejecting it." Dallio v. Spitzer, 343 F.3d 553, 560 (2d Cir. 2003)(quoting Brown v. Artuz, 283 F.3d 492, 498 (2d Cir.2002); and citing Aparicio v. Artuz, 269 F.3d 78, 93-94 (2d Cir.2001); Sellan v. Kuhlman, 261 F.3d 303, 312 (2d Cir.2001)).

Where, as in the present case, "'there is no basis either in the history of the case or the opinion of the Appellate Division for believing' that the claim at issue 'was denied on procedural or any other nonsubstantive grounds,' a terse statement that 'remaining contentions are without merit' suffices to trigger AEDPA's heightened standard of review." Dallio, 343 F.3d at 560 (quoting Brown, 283 F.3d at 498).

Accordingly, in light of the language used by the Appellate Division, this Court makes the following findings: (1) all aspects of Petitioner's Aney/Hobika ineffective assistance claim were adjudicated on the merits by the State courts, (2) all aspects of the claim are therefore subject to review under AEDPA's heightened standard, and (3) pursuant to Pinholster, this Court's review of the Aney/Hobika ineffective assistance claim is limited to the record presented to the Appellate Division.

20

Before proceeding to a review of the Appellate Division's decision, a further clarification is necessary.  Petitioner also raised the Aney/Hobika conflict claim in his first 440 motion and articulated the claim in a more extensive and vigorous fashion. (Exhibit G).

The County Court denied that aspect of the 440 motion, citing CPL § 440.10 (a)(2), which provides that "the court must deny a motion to vacate a judgment when: ... [t]he ground or issue raised upon the motion was previously determined on the merits upon an appeal from the judgment, unless since the time of such appellate determination there has been a retroactively effective change in the law controlling such issue...." (Exhibit H).

The County Court noted that Petitioner had raised the Aney/Hobika conflict claim on direct appeal and in a thoroughgoing fashion via his motion for leave to appeal to the Court of Appeals, which motion was denied.  Id.  Thus, the County Court unambiguously rested its denial of this claim on the procedural state law ground that Petitioner had previously raised and unsuccessfully litigated the claim on direct appeal.

Federal courts are not permitted to "review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." Coleman v. Thompson, 501 U.S. 722, 729, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991) (citations omitted). "This rule applies whether the state law ground is substantive or procedural." Id. (citations omitted).

The courts in this Circuit have generally concluded that a denial pursuant to C.P.L. § 440.10(2)(a) is an "adequate and independent" state procedural ground barring federal habeas review. See, e.g., Encarnacion v. Walker, No. 96CV329FJSGLS, 1998 WL 34002608, at *4 (N.D.N.Y. Aug. 21, 1998) ("The state trial court's ruling rested on an adequate and independent state procedural rule, N.Y.Crim. Proc. Law § 440.10(2)(a) & (b),

21

which provides that a court must deny a motion to vacate a judgment if the issue raised

was previously determined on appeal from the judgment, or the judgment is appealable or

pending on appeal and sufficient facts appear on the record to permit adequate review.");

D'Alessandro v. Fischer, No. 01 Civ. 2551 LTS/DF, 2005 WL 3159674, at *19 (S.D.N.Y.

Nov. 28, 2005) ("[T]he trial court's express reliance on CPL § 440.10(2)(a) indicates that

the court rejected Petitioner's ineffective assistance claim on an independent and adequate

state procedural ground, precluding federal habeas review."); McClarin v. Smith, No.

05-CV-2478, 2007 WL 2323592, at *17 (E.D.N.Y. Aug. 10, 2007)("In addition, the court

found the due process claim procedurally barred by New York Criminal Procedure Law §

440.10(2)(a) because it had been adjudicated on the merits during petitioner's direct

appeal. As such, petitioner's ineffective assistance of counsel claim is procedurally barred

because the state court rejected it on an adequate and independent state procedural

ground."); but see Douglas v. Hollins, No. 00 Civ. 7928, 2004 WL 187130, at * 6 n. 5

(S.D.N.Y. Jan. 29, 2004) (finding that state court ruling under CPL § 440.10(2)(a) "does not

constitute a finding of procedural default that precludes federal habeas review of the

merits"); Guzman v. Couture, No. 99-CIV-11316, 2003 WL 165746, at *11 (S.D.N.Y. Jan.

22, 2003) ("A dismissal under § 440.10(2)(a) is not based on any procedural default. To the

contrary, it is premised on a prior decision.").[7]

    In accord with the majority view in this Circuit, this Court finds that the County

Court's citation of CPL § 440.10 (2)(a) in support of its denial of the Aney/Hobika conflict

---

[7]The Second Circuit authority on this issue is inconclusive.  See Fernandez v. Artuz, 402 F.3d
111, 115 n. 4 (2d Cir.2005) (identifying CPL §§ 440.10(2)(a) as procedural bar under New York law) (citing
Artuz v. Bennett, 531 U.S. 4, 8 (2000)); but see Silverstein v. Henderson, 706 F.2d 361, 368 (2d Cir.1983)
(stating that a state court ruling under CPL § 440.10(2)(a) "does not constitute a finding of procedural
default that would bar federal consideration of [petitioner's] claims").

claim rested the court's decision upon an adequate and independent state law ground, thereby precluding habeas review of that aspect of the County Court's decision. Accordingly, habeas review concerning the Aney/Hobika conflict claim is limited to the Appellate Division's decision and to the record before that court.

### e.    AEDPA Review of Aney/Hobika Claim

As noted above, Petitioner was arrested on March 15, 1994, and charged with murder.  It is undisputed that Attorney Aney appeared in court on March 16, 1994, and indicated that he would be acting as Petitioner's attorney.  It is further undisputed that Aney visited Petitioner at the jail during the evening hours of that same day.  The grand jury indicted Petitioner on March 18, 1994.   On that same date, Petitioner retained Attorney Ken Ray as his trial attorney and Ray appeared as Petitioner's counsel on March 22, 1994, when Petitioner was arraigned on the indictment.  Attorney Hobika never entered a formal appearance as Petitioner's counsel in any court with regard to the murders.  Petitioner entered into a written retainer agreement with Attorney Ray, but there is no evidence of any retainer agreements between Hobika/Aney and Petitioner.  There is likewise no evidence that Hobika or Aney ever received any payment for legal services rendered to Petitioner in connection with the case.

As discussed above, Petitioner contends that (a) Aney and Hobika were his attorneys throughout the pre-arrest period (*i.e.* following the murders and during the police investigation) and following his arrest, until Attorney Ray was retained on March 18th; (b) Aney and Hobika were simultaneously representing other prosecution targets (*i.e.* Crocilla and Cuda); and (c) their conflicting interests prejudiced Petitioner and deprived him of right to effective assistance of counsel, as guaranteed by the U.S. Constitution.

23

i.      Pre-Arrest Period (October 7, 1993 - March 14, 1994)

The question of whether Attorneys Aney and/or Hobika represented Petitioner during the pre-arrest period was presented to and decided by the State courts.  On January 27, 1995, following a multi-day, pre-trial <u>Huntley</u> hearing,[8] the trial court issued a Memorandum and Decision finding that Petitioner was not represented by Attorneys Aney or Hobika (or, indeed, any attorney) with regard to the murder investigation prior to the date of his arrest (March 15, 1994). (PE #18).   The Appellate Division affirmed the trial court's decision. <u>People v. Pepe</u>, 689 N.Y.S. 2d 310, 312 (4th Dep't 1999)("We perceive no basis in the record to disturb the court's findings that the statements were made voluntarily, that defendant voluntarily waived his right to counsel when he was in custody and did not ask for counsel when he was interviewed, and that defendant was not represented by counsel when the statements were made.").

The background concerning the <u>Huntley</u> decision may be summarized as follows: Petitioner challenged the admissibility of three (3) statements made during the pre-arrest period, arguing that he was represented by Attorneys Aney and Hobika when those statements were made and, thus, the statements were taken in violation of his right to counsel.  The <u>Huntley</u> hearing spanned several days, with the trial court receiving testimony from numerous witnesses, including Petitioner, David Benner (Petitioner's accomplice), and members of the Utica Police Department.

In particular, Petitioner sought to suppress a statement he made to the police on October 12, 1993, on the grounds that the police had taken the statement even though

---

[8] A hearing pursuant to <u>People v. Huntley</u>, 255 N.Y.S.2d 838 (1965), is held to determine the voluntariness of a criminal defendant's statement(s) to the police.

Petitioner repeatedly referred them to Aney and Hobika.  The trial court concluded that Petitioner's testimony was not consistent with his contemporaneous conduct and that he had not established the existence of an attorney-client relationship with either Aney or Hobika during October of 1993. (PE #18, at p. 4-5).

Specifically, Petitioner testified that he had been questioned by the police several times between the murders and October 12, 1993, but had refused to make a statement and repeatedly referred the police to Aney and Hobika.  Petitioner claimed he told the police that he would not make a statement without Aney or Hobika present.  (PE # 18, at p. 4-5). Petitioner then visited the police station on two occasions shortly thereafter, ultimately providing a statement on October 12th without an attorney present. (PE # 18, at p. 5). Although Petitioner claimed that he attempted unsuccessfully to contact Hobika to request his presence during the October 12th police interview, he never sought to postpone the meeting until a time when Hobika could be present and provided the statement even though neither Hobika nor Aney was present. (PE # 18, at p. 5).  The trial court noted that requesting a postponement "would have been the logical course of action" if Petitioner had actually been represented and wanted Hobika present. (PE # 18, at p. 5).  The trial court also referenced the lack of documentary or other evidence supporting Petitioner's claim of a verbal retainer agreement with Attorney Hobika. (PE # 18, at p. 5).

On March 11, 1994, the Utica Police used co-defendant David Benner as their agent to tape-record a conversation with Petitioner.  During the recorded conversation, Petitioner

made incriminating statements.[9]   The trial court found that although Petitioner made reference to calling an attorney during his conversation with Benner, his "mere assertion that he called an attorney [did] not unequivocally prove that he requested counsel or that he retained counsel." (PE #18, at p. 13).   In addition, the trial court credited testimony from Benner to the effect that he had never seen Petitioner contact an attorney regarding the murders and that Petitioner never told him that he had spoken with Aney, Hobika, or any other attorney regarding his involvement in the murders. (PE #18, at p. 13).

Petitioner made a further statement to the Utica Police on March 15, 1994 (the day of his arrest).  Before making the statement, Petitioner signed a <u>Miranda</u> waiver. (PE #18, p. 16).  Petitioner admitted that the incident with Zajac and Brewer was a drug deal/robbery gone awry.  (TT at 1015-16).  He acknowledged possessing a gun at the murder scene. (TT at 1016-17, 1020).   Petitioner admitting being present at the murder scene and hearing gunshots, but was vague about whether he pulled the trigger. (TT at 1020).  The trial court declined to suppress this statement, finding that Petitioner knowingly and voluntarily waived his <u>Miranda</u> rights.  The court also found no evidence that Petitioner ever requested the assistance of counsel during the interview, which lasted an hour and a half. (PE #18, at p. 17).  As noted above, the trial court's decision was affirmed by the Appellate Division. <u>Pepe</u>, 689 at 312.

The trial court's factual findings are entitled to a presumption of correctness, which

---

[9]When Benner asked Petitioner about bloody cloths/rags from the murder scene, Petitioner assured him that they were "gone" and told Benner he had spent "over two thousand to clean the whole place." (Transcript of March 11, 1994, wire tap recording, at p. 10-11).  When asked whether he had burned their clothing from the crime scene, Petitioner confirmed that the items were "Gonesville." (<u>Id.</u> at 23).  Petitioner also talked about the shooting and his feelings in the immediate aftermath. (<u>Id.</u> at 26-27).  Petitioner encouraged Benner to forget the murders, reminding him that it "wasn't personal" and it "was all business." (<u>Id.</u> at 47).

may only be rebutted under 28 U.S.C. § 2254 (e)(1) by clear and convincing evidence. Specifically, § 2254 (e)(1) provides that "a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

Petitioner contends that the "clear and convincing evidence" standard does not apply here because the state court's determination concerning pre-arrest representation was made in a specific context, namely, deciding whether Petitioner's statements should be suppressed as taken in violation of his right to counsel (as opposed to whether Petitioner's attorneys were operating under an actual conflict of interest).  This Court views that argument as making a distinction without a difference.  The state court held an evidentiary hearing, weighed the evidence (including testimony from numerous witnesses), and concluded that Petitioner was not represented by counsel during the pre-arrest phase.  That is the same factual issue relevant to this Court's review of the Aney/Hobika ineffective assistance claim - *i.e.* was Petitioner represented by Aney and/or Hobika during the pre-arrest period.

This Court is not at liberty to revisit or reconsider *de novo* the <u>Huntley</u> hearing evidence to reach its own conclusion about whether the evidence supported Petitioner's claim that he was represented by Aney and Hobika during the pre-arrest period.  The trial court's decision makes it clear that the evidence presented at the <u>Huntley</u> hearing, which lasted several days, was carefully considered and weighed.  Although reasonable jurists

might reach different conclusions regarding the interpretation of that evidence,[10] Petitioner has not overcome the presumption of correctness afforded to the trial court's findings. See Rice v. Collins, 546 U.S. 333, 341-42, 126 S.Ct. 969, 163 L.Ed.2d 824 (2006)("Reasonable minds reviewing the record might disagree about the prosecutor's credibility, but on habeas review that does not suffice to supersede the trial court's credibility determination").  In other words, Petitioner has not sufficiently demonstrated that the trial court's decision was "unreasonable" or based upon a factual premise contradicted by clear and convincing evidence. See Miller–El v. Cockrell, 537 U.S. 322, 123 S.Ct. 1029, 1040–41, 154 L.Ed.2d 931 (2003).

Petitioner attempts to overcome the AEDPA deference problem by arguing that Respondent admitted that Aney and Hobika represented Petitioner during the pre-arrest period in a brief submitted with respect to the direct appeal.  This argument is unavailing.

The prosecution's brief in opposition to Petitioner's direct appeal contained the following statement: "[E]arlier in the proceedings, the defendant had been represented initially by Joseph Hobika, Jr. and then briefly by George Farber Aney, III.  Later, both attorney's [sic] represented witnesses who testified at trial for the People." (Exhibit B, at p. 22).  The brief does not contain a citation in support of these factual statements or indicate

---

[10]Having reviewed the Huntley hearing evidence and having had an opportunity to evaluate the credibility of the key players during the Sparman hearing, this Court would reach a different conclusion if permitted to review the matter de novo.  The claims and contentions of Attorneys Aney and Hobika were simply not believable (e.g., Aney's claim that did not "really" represent "anyone" in the case and Hobika's assertion that he attended the grand jury proceedings as a "learning experience").  Their demeanor evidenced only a passing regard for the truth and they displayed virtually no fear or concern regarding the consequences of their actions.  Their testimony was transparently tailored to deflect responsibility and obfuscate the truth.  However, this Court is constrained both by the evidentiary limitation imposed by the Supreme Court in Pinholster and the highly deferential AEDPA standard applicable to state court fact findings.  A reasonable jurist could interpret the evidence presented in the state court proceedings the way the trial court did.  As such, because this Court has a limited role to play in this process (and may not act as a "super" appellate tribunal), it must defer to the state court's findings of fact.

the basis for the prosecutor's knowledge concerning these matters.   The reference to Attorney Aney's representation is unremarkable - all are agreed that Aney at the very least briefly represent Petitioner "earlier in the proceedings" (*i.e.* at a court appearance held the day after his arrest).   The fact that the prosecutor referenced this fact does not necessarily constitute an admission that Aney represented Petitioner during the pre-arrest period.   The prosecutor's statement that Aney represented Petitioner "earlier in the proceedings" from the reference point of the trial could readily be interpreted to refer to the single court appearance Aney made on Petitioner's behalf during the post-arrest, pre-indictment period.

The question is whether the prosecutor's statement in the brief conceded that Attorney Hobika represented Petitioner "earlier in the proceedings," a point very much in dispute.   (Respondent argues that Hobika never represented Petitioner).   On this point, however, this Court concludes that it cannot find a reason under the current case law constraints to disregard the factual findings of the trial court based upon the prosecution's unguarded statement contained in an appellate brief.

The trial court reached its <u>Huntley</u> hearing decision based upon actual testimony from witnesses with direct involvement in the pre-arrest proceedings.   Even if the prosecutor's statement in the brief is liberally construed as having some evidentiary weight, it cannot constitute clear and convincing evidence sufficient to overcome the presumption of correctness afforded under AEDPA to the trial court's factual finding that Aney and Hobika did not represent Petitioner during the pre-arrest period.

Moreover, the balance of the prosecutor's argument makes the point that Hobika's representation and alleged conflict of interest did not warrant reversal of the conviction.   As such, it appears that the prosecutor reasoned that he could concede the fact of Hobika's

29

representation without risking reversal.  If true, this provides an explanation (but not an excuse) for the prosecutor's apparent failure to verify his facts and undermines the suggestion that the statement constitutes a deliberate admission of fact by the prosecution.

Indeed, but for this single reference, the prosecution consistently took the position that Hobika never represented Petitioner.  For example, the District Attorney's letter in opposition to Petitioner's application for leave to appeal to the Court of Appeals references the lack of proof that Hobika ever represented Petitioner. (Respondent's Exhibit D)("While Appellant makes the self-serving claim that Hobika represented him during [the] police investigation of the matter, no proof of such representation was ever set forth.").[11]  Likewise, the District Attorney's opposition to the 440 motion contends that "save for" Petitioner's allegations, "there is no proof whatever that Joseph Hobika ever represented [petitioner] at all on the instant matter." (Respondent's Exhibit E). While the Court disagrees with the District Attorney's position on this issue, his otherwise consistent position tends to nullify the concession expressed in the appellate brief.

Accordingly, this Court finds unavailing Petitioner's claim that Respondent conceded or admitted the fact of Attorney Hobika's representation.  Moreover, even if the stray reference in the appellate brief to Hobika's alleged representation of Petitioner was considered an admission of some evidentiary value, it would not constitute clear and convincing evidence sufficient to overcome the trial court's Huntley findings.

In sum, Petitioner has not established that the State court's factual finding that he

---

[11]References to "Respondent's Exhibit" refer to exhibits introduced by Respondent at the Sparman hearing.  Consideration of these exhibits is not foreclosed by Pinholster because these documents were part of the original state court record.  They were not included in the documents originally provided to this Court when the case was filed, but were produced during the Sparman hearing.

was not represented by Attorneys Aney or Hobika during the pre-arrest period was based upon a factual premise contradicted by clear and convincing evidence. As such, because Petitioner cannot overcome this factual determination, his ineffective assistance of counsel claim with regard to Attorneys Aney and Hobika must fail as it relates to the pre-arrest period. This aspect of Petitioner's ineffective assistance claim is based upon an alleged conflict of interest, which requires, as a threshold matter, a showing that Attorneys Hobika and/or Aney represented Petitioner during the pre-arrest period while simultaneously representing other prosecution targets. Given the high degree of deference afforded to state court factual findings under AEDPA, this Court finds that Petitioner has not made such a showing.

### ii.  Post-Arrest, Pre-Indictment Period (March 15 - March 18, 1994)

As discussed above, the following facts were clearly established in the state court records and are not disputed by the parties:

Following his arrest on March 15, 1994, Petitioner was arraigned in Utica City Court, whereupon he advised the court that he was represented by Attorney George Aney. (PE #8, at p. 8a). Petitioner explained that he had called Aney's office and had been told that Aney was in Florida. (Id.). Petitioner also indicated that Attorney Hobika was his lawyer and inquired as to whether Hobika could appear on his behalf until Aney returned from Florida. (Id. at 10a). A court clerk stated that she believed Hobika might have called the court. (Id. at 11a).

Attorney Aney appeared on Petitioner's behalf at a court hearing in Utica City Court on March 16, 1994, whereupon Aney indicated that he would be representing Petitioner and

intended to make a bail application shortly. (PE #9, at p. 19a).  Aney visited Petitioner in jail

that evening.   (Court Exhibit #1).   Petitioner was indicted by the grand jury on March 18,

1994.  Attorney Ken Ray was retained by Petitioner's family pursuant to a written retainer

agreement dated that same day. (Respondent's Exhibit A).   Attorney Ray appeared on

Petitioner's behalf at the arraignment held on March 22, 1994.  (PE #3).

Petitioner contends that during the three-day period between his arrest (on March

15th) and the indictment/retention of Ray (on March 18th), Attorneys Aney and Hobika were

acting as his attorneys while they simultaneously represented prosecution targets and grand

jury witnesses Dominic Crocilla and Matthew Cuda, thereby creating an actual conflict of

interest that deprived Petitioner of the effective assistance of counsel.   For the sake of

convenience, this three-day period will be referred to as the "post-arrest, pre-indictment

period."

With regard to Attorney Hobika, Petitioner's claim must fail.  There was simply no

evidence presented to the trial court or Appellate Division regarding Hobika's alleged

simultaneous representation of Petitioner and the prosecution witnesses (Crocilla and Cuda)

during the post-arrest, pre-indictment period. As discussed above, Petitioner offered

testimony at the Huntley hearing to the effect that Hobika was his attorney during the *pre*-

arrest period, but the trial court found that testimony not credible.

There was some evidence in the state court record suggesting that Hobika

represented Crocilla in January of 1995, shortly before the start of Petitioner's trial and

nearly a year after the post-arrest, pre-indictment period.[12] However, there was no evidence

---

[12]Hobika's appearance, along with Aney, as counsel for Crocilla was noted at a bail hearing held
on January 25, 1995, shortly before Petitioner's trial began. (PE #17).

presented to the state court that Hobika simultaneously represented Petitioner, Crocilla, or Cuda during the three-day post-arrest, pre-indictment period.[13]   Accordingly, this Court cannot find, based upon the evidentiary record, limited by <u>Pinholster</u> to the record presented to the state courts, that the Appellate Division's decision regarding Attorney Hobika was "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[14]

The situation is more complicated as it relates to Attorney Aney.  There is no question that Aney represented Petitioner for at least one court appearance on March 16, 1994. During that court appearance Aney advised that he would be appearing for Petitioner from that point forward.  Indeed, Attorney Aney stated that he would be preparing and bringing a bail application on behalf of Petitioner.  It is clear that Aney's representation ended no later than March 18, 1994, when Petitioner's parents retained Attorney Ray to act as Petitioner's counsel.  The State court record is inconclusive as to whether Aney's representation ended

---

[13]This Court is constrained by <u>Pinholster</u> from considering the <u>Sparman</u> evidence, which established quite clearly that Hobika represented Matthew Cuda before the grand jury.  Hobika admitted that he accompanied Cuda to the grand jury.  To explain this conduct, Hobika offered the preposterous claim that he accompanied Cuda to the grand jury as a "learning experience" and for "moral support," but not as his lawyer. (SH at 110-112, 129).  Cuda testified credibly that Hobika attended the grand jury proceedings as his attorney. (SH at 370-75, 380, 390).

[14]Evidence of Attorney Hobika's representation was presented to the 440 court via the affirmation of Charles Wason, an attorney associated with Attorney Ray, Petitioner's trial counsel.  As discussed above, however, the conflict of interest claim asserted in Petitioner's 440 motion was denied based upon an adequate and independent state law ground and is therefore is not subject to habeas review.  Further, even if this Court were to credit Wason's statements and find that there was evidence presented to the state courts that Hobika represented Petitioner, Petitioner would still not be entitled to relief for the reasons outlined below regarding Attorney Aney.  In sum, there was insufficient evidence *presented to the state courts* that Hobika simultaneously represented Petitioner and Crocilla and/or Cuda.  Moreover, even if there was a conflict of interest based upon simultaneous representation, Petitioner has not established that the conflict "adversely affected" Hobika's performance.  The facts establish that pursuit of a plea agreement was not a plausible strategy during the post-arrest period and Petitioner's claims regarding the alleged divulging of confidences are too speculative to warrant relief.  As such, even if the 440 evidence is considered, and the state court procedural bar could be overcome, Petitioner has still not established that the Hobika conflict of interest "adversely affected" his performance (as that phrase is used in this context) and is therefore not entitled to habeas relief.

at some point prior to March 18, 1994.

As discussed above, the Appellate Division assumed for the sake of argument that Aney represented Petitioner during the post-arrest, pre-indictment period and concluded that any possible conflict of interest during that period was not prejudicial to Petitioner. In the absence of evidence that Aney's representation terminated *prior* to March 18th, it seems reasonable to adopt the Appellate Division's presumption that the representation continued until the point at which the retainer agreement with Ray was executed. As such, this Court will presume, as did the Appellate Division, that Attorney Aney represented Petitioner between March 16, 1994, and March 18, 1994 (the entire post-arrest, pre-indictment period).[15] With that assumption as foundation, this Court proceeds to an examination of the impact of an actual conflict of interest on the constitutional right to counsel.

The Sixth Amendment guarantees criminal defendants "the right . . . to have the Assistance of Counsel for his defense." U.S. Const. Amend. VI. The right to counsel implies the right to an attorney unburdened by a conflict of interest. See Wood v. Georgia, 450 U.S. 261, 271 (1981)(noting that "[w]here a constitutional right to counsel exists, our Sixth Amendment cases hold that there is a correlative right to representation that is free from conflicts of interest").

In this Circuit, there are three general categories of conflicts to be considered when assessing a defendant/petitioner's claim that his constitutional right to counsel was violated

---

[15]This Court's analysis would not change even if one were to assume that Aney's representation began on the date of the arrest (March 15, 1994) and/or did not end until Ray formally appeared as Petitioner's attorney on March 22, 1994, when Petitioner was arraigned on the grand jury indictment. In addition, as noted above, the analysis does not change even if Attorney Hobika represented Petitioner during this period. Petitioner's claim would fail for the same reason - i.e. based upon the lack of sufficient evidence that the conflict of interest "adversely affected" counsel's performance.

by a conflict of interest: (1) *per se* conflicts, which do not require any showing of prejudice by the defendant/petitioner; (2) actual conflicts, which carry a presumption of prejudice; and (3) potential conflicts, which require a showing of both deficient performance by counsel and prejudice.  See United States v. Doe No. 1, 272 F. 3d 116, 125 (2d Cir. 2001).

The present case does not implicate the very narrow category of *per se* conflicts, which exist only when the attorney was unauthorized to practice law or was implicated in the criminal activity with which his or her client is charged.  See United States v. Rondon, 204 F.3d 376, 379-80 (2d Cir. 2000).  Rather, this case involves a claim that Attorney Aney was operating under an actual conflict by virtue of his concurrent representation of Petitioner and witnesses before the grand jury (*i.e.* Crocilla and/or Cuda).  The concurrent representation of multiple defendants is an "actual conflict of interest" sufficient to invoke the presumption of prejudice under applicable Supreme Court precedent.  See Mickens v. Taylor, 535 U.S. 162, 175 (2002).

However, Petitioner's claim faces an immediate proof problem due to the lack of evidence in the state court records that Aney represented Crocilla and/or Cuda during the post-arrest, pre-indictment period.[16]  Petitioner does not even have an arguable actual conflict of interest claim unless there was, in fact, concurrent representation of Petitioner and one (or more) prosecution targets/grand jury witnesses.  Given the lack of evidence in the state court record concerning Aney's alleged representation of Crocilla and/or Cuda during the relevant time period, this Court cannot conclude that the Appellate Division's

---

[16]Ample and credible evidence regarding the simultaneous representation was presented at the Sparman hearing (see footnote 19 below).  However, as discussed elsewhere in this Report and Recommendation, this Court is constrained by Pinholster and its review must be limited to the evidence presented to the relevant state courts.

decision rejecting Petitioner's conflict of interest claim was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," as would be required to grant relief under the AEDPA standard.

Moreover, for the reasons outlined below, habeas relief is not available even if one assumes for the sake of argument that Aney simultaneously represented Petitioner and Cuda/Crocilla.

Although a defendant must ordinarily establish prejudice to prevail on an ineffective assistance of counsel claim, "[p]rejudice is presumed . . . if the defendant demonstrates that counsel 'actively represented conflicting interests' and that 'an actual conflict of interest *adversely affected* his lawyer's performance.'" Cuyler v. Sullivan, 446 U.S. 335, 350 (1980)(emphasis added). These components are "considered in a single, integrated inquiry" and, as such, an "actual conflict," in the context of the Sixth Amendment, is "a conflict of interest that adversely affects counsel's performance." Eisenmann v. Herbert, 401 F.3d 102, 107 (2d Cir. 2005)(quoting Mickens, 535 U.S. at 172 n. 5).

The Circuits have reached different conclusions with regard to how a defendant demonstrates that a conflict "adversely affected" counsel's performance.  The Second Circuit has held that the defendant "need suggest only a 'plausible' alternative strategy that was not pursued at trial, not necessarily a 'reasonable' one." Eisenmann, 401 F.3d at 107 (quoting United States v. Feyrer, 333 F.3d 110, 116, 118 (2d Cir. 2003)).  Furthermore, the Second Circuit has concluded that "[w]ith respect to the substance of the plausible alternative strategy, the defendant need not show that the defense would necessarily have been successful had it been used, only that 'it possessed sufficient substance to be a viable alternative.'" Id. (quoting Feyrer, 333 F.3d at 116).

36

In contrast, other Circuits have taken a "slightly more demanding approach, requiring suggestion of a defense that was objectively reasonable." Id. (collecting cases).  Under that standard, the defendant must: (1) "identify a plausible alternative defense strategy or tactic that defense counsel might have pursued," (2) "show that the alternative strategy or tactic was objectively reasonable under the facts of the case," and (3) "establish that the defense counsel's failure to pursue the strategy or tactic was linked to the actual conflict." Mickens v. Taylor, 240 F.3d 348, 361 (4th Cir. 2001); see also Covey v. United States, 377 F.3d 903, 908 (8th Cir. 2004), Quince v. Crosby, 360 F.3d 1259, 1264-65 (11th Cir. 2004).

Here, Petitioner offers two defense strategies that he contends Aney could have pursued during the post-arrest, pre-indictment period and argues that Aney failed to pursue those strategies because they were inherently in conflict with his concurrent representation of Crocilla and Cuda.  Specifically, Petitioner argues that Aney could (and should) have pursued a plea agreement on Petitioner's behalf during this time period and should have encouraged Petitioner to testify before the grand jury.

With regard to the alleged failure to pursue a plea agreement, this Court is not persuaded that pursuit of a plea bargain during the post-arrest, pre-indictment period was a plausible defense strategy, let alone an objectively reasonable one.  As such, Petitioner's claim fails whether one applies the "objectively reasonable" standard for determining adverse effects or the Second Circuit's more lenient "plausible alternative" test.

The "failure to obtain a plea bargain is not evidence of ineffective assistance of counsel when the record does not contain evidence that one might have been offered." Eisemann, 401 F.3d at 109 (citing Burger v. Kemp, 483 U.S. 776, 785-89 (1987)).

In the present case, as in Burger and Eisemann, the "notion that the prosecutor

37

would have been receptive to a plea bargain is completely unsupported by the record." Id.

(quoting Burger,  483 U.S. at 785).   Once Benner (Petitioner's accomplice) began

cooperating, it is not clear what evidence Petitioner might have offered the prosecution

against Crocilla, Cuda, Benner, or anyone else that might have induced the prosecutor to

plea bargain.  Indeed, given the strength of the prosecution's case against Petitioner, which

included statements from Benner and incriminating statements by Petitioner (wherein he

admitted being present at the murder scene in possession of a gun and admitted covering

up the murders), it is difficult to envision a scenario in which the prosecution would have

been interested in offering Petitioner any meaningful benefit in exchange for his

cooperation.[17]

        While Petitioner does not need to prove "that the negotiation of a plea bargain would

have been successful, the strategy must nevertheless 'possess [ ] sufficient substance to

be a viable alternative." Eisemann, 401 F. 3d at 110 (quoting Winkler v. Keane, 7 F.3d 304,

309 (2d Cir. 1993)); see also Armienti v. United States, 313 F.3d 807, 811 (2d Cir.

2002)(rejecting ineffective assistance claim based upon failure to pursue plea agreement

_____

[17]The considerations outlined above were not in play during the pre-arrest period, when Petitioner
might have had more to offer the prosecution.  However, as discussed in detail above, Petitioner has not
overcome the presumption of correctness afforded to the state courts' determination that he was not
represented by Aney (or Hobika) during the pre-arrest period.  There was also no evidence presented to
the state courts that Attorney Aney (or Hobika) simultaneously represented Crocilla and/or Cuda during
the pre-arrest period.  This Court does note, however, that it is troubled by the evidence elicited during the
Sparman hearing concerning efforts to induce Petitioner to plea bargain as an apparent means of
protecting others involved in potential criminal conduct.  According to testimony from Matthew ("Matty")
Cuda, for example, he was sent as an emissary apparently by a group of his unnamed associates,
including attorney Aney, to speak with Petitioner to convince him to accept a plea bargain of from 12 to 25
years, "otherwise [petitioner] would get 60 years."  The clear implication from Cuda's testimony was that
he, Crocilla, and Aney  were concerned about keeping Petitioner in the fold and neutralizing any potential
damage he could do to them.  In his conversation Cuda made it abundantly clear that Aney would
represent Petitioner free of charge.  However, because Petitioner's parents were suspicious of Aney, they
refused to cooperate with the proposed arrangement and secured representation by retaining Attorney
Ray.  Ultimately, Crocilla and Cuda, represented by Aney, were not charged with any crime,
notwithstanding ample evidence of their involvement in, at a minimum, the obstruction of justice.

due to lack of evidence that defendant "had any information to offer" against third party and absence of "convincing evidence that the prosecution was interested in obtaining information from [defendant]").  For the reasons outlined above, this Court finds that the plea bargain strategy did not possess sufficient substance to be a viable alternative during the post-arrest, pre-indictment period.

Moreover, Petitioner's repeated claims of innocence and the fact that he ultimately proceeded to trial undermine his suggestion that pursuing a plea bargain during the post-arrest, pre-indictment period was a plausible (or objectively reasonable) defense strategy. It is not clear that Petitioner would have accepted a plea bargain even if one had been sought and an offer had been made. See Armienti, 313 F. 3d at 815 ("The facts surrounding [defendant's] own refusal to pursue a plea agreement, however, negate the notion that it was a plausible alternative under the adverse effects standard.")(citing United States v. Yost, No. 98 CR. 974, 2001 WL 536937, at *7 (S.D.N.Y. May 21, 2001)).

With regard to the possibility of counseling Petitioner to exercise his right to testify before the grand jury, Petitioner has not demonstrated that this was a plausible defense strategy (or, for that matter, an objectively reasonable one).  It is difficult to understand how waiving his Fifth Amendment rights and testifying before the grand jury was likely to prevent an indictment or otherwise help Petitioner, particularly given the strength of the prosecution's case.  Indeed, encouraging Petitioner to waive his protection against self-incrimination and testify before the grand jury would have been highly imprudent under the circumstances. See, e.g., Kohler v. Kelly, 890 F. Supp. 207, 213 (W.D.N.Y.1994)("There are a number of valid, tactical reasons for counsel to decide that [a defendant] should not testify before the grand jury.  If [defendant] had testified, he would have exposed himself to cross-examination

39

by the prosecution, and could have been questioned about his previous crimes. In addition, he would have waived the privilege against self-incrimination with regard to the information he volunteered. This provides the prosecution with valuable pretrial discovery, and also gives the prosecution material with which to impeach the defendant if he testifies at trial.").

As such, counseling Petitioner to testify before the grand jury was not a plausible (let alone objectively reasonable) alternative strategy.  Moreover, common to both of the "adverse effects" approaches is the requirement that the defendant establish a link between counsel's failure to pursue the strategy in question and the conflict of interest. See Eisemann, 401 F.3d at 108 ("In order to demonstrate that a conflict of interest adversely affected representation even under this Circuit's lenient standard, [the defendant] must show that at least some plausible defense strategy was forgone *as a consequence of* [counsel's] conflict of interest.")(emphasis added); United States v. Nicholson, 611 F.3d 191, 212 n. 19 (4th Cir. 2010)(noting the "link" requirement is common to both approaches).

In this case, given the legitimate tactical reasons for not encouraging Petitioner to testify before the grand jury, Aney's alleged conduct in that regard cannot be said to have been "linked to" or inherently connected with any alleged concurrent representation of Crocilla and/or Cuda.  In other words, ample legitimate reasons existed for encouraging Petitioner not to testify before the grand jury, separate and apart from any difficulties such testimony might have theoretically posed for Aney's other clients.

Petitioner also contends that Aney shared his confidences with James Pugliese, a prosecution witness.  Pugliese was called by the prosecution as a rebuttal witness at trial. Pugliese testified with Attorney Aney acting as his attorney and with Aney sitting right next

40

to him. (TT at 1575, 1589).  Pugliese testified that on October 6, 1993 (shortly before the murders), he overhead a conversation in which Petitioner told a third party (William Bullis) that he [Petitioner] needed a gun. (TT at 1571-72).  Petitioner now claims that, following his arrest, he confided concerns to Aney about what Pugliese may have overheard.  Petitioner further alleges that Aney shared that confidence with Pugliese and encouraged Pugliese to divulge that information to the prosecution to obtain a favorable disposition of a narcotics charge lodged against him.  Petitioner also suggests that Aney may have divulged confidences to Crocilla as part of an effort to obtain a more favorable disposition for Crocilla in connection with the murder investigation.

Petitioner's claim must fail.  The record before the trial court and Appellate Division did not contain any details concerning the nature of the confidences allegedly shared with Aney, let alone any evidence that those confidences were divulged or that any such disclosure was prejudicial to Petitioner.  Petitioner's brief on direct appeal makes generic reference to "confidential and strategically valuable information" allegedly obtained by Aney (and Hobika) while representing Petitioner. (Exhibit A, at p. 20)(emphasis in original). Petitioner's affidavit in support of his 440 motion likewise contains a vague reference to the fact that Petitioner "openly discussed" the details of the case with Aney and Hobika. (V. Pepe Affidavit, attached as part of Exhibit G).  While it is certainly possible that Petitioner shared information with Aney and Hobika, given the lack of specific evidence related to this claim (and mindful of the evidentiary restriction recognized in Pinholster), this Court cannot find that the Appellate Division's decision rejecting this claim was "based upon  an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

41

Accordingly, for the reasons outlined above, this Court finds that Petitioner is not entitled to habeas relief with respect to his claim that he was deprived of his Sixth Amendment right to the effective assistance of counsel based upon alleged conflicts of interest involving Attorneys Joseph Hobika and/or George Aney.

### f.      Recommendation of Attorney Misconduct Referral/Investigation

Notwithstanding the finding that Petitioner did not establish a constitutional violation arising from Attorney Aney and Hobika's conduct sufficient to warrant habeas relief, this Court finds that the evidence presented at the <u>Sparman</u> hearing credibly and conclusively established serious lapses in legal ethics and professional judgment by Attorneys Hobika and Aney.  This Court has no doubt that Hobika and Aney simultaneously represented Petitioner and grand jury witnesses during the relevant time periods.  Further, this Court believes that Hobika and Aney were untruthful during their <u>Sparman</u> hearing testimony. Their demeanor evidenced a casual disregard for the truth and their testimony was transparently tailored to avoid responsibility.

Attorney Hobika's claim that he did not represent Petitioner during the pre-arrest period was contradicted by Charles Wason, an attorney with no apparent motive to misrepresent.  Wason was an associate of Kenneth Ray, Petitioner's trial counsel. Wason testified that Petitioner told him that Hobika had represented him during the police investigation and that Hobika had instructed Petitioner to refer all police questions to Hobika or Aney. (SH at 30). In anticipation of the pre-trial <u>Huntley</u> hearing, Wason telephoned Hobika.  According to Wason, Hobika confirmed his communications with Petitioner and acknowledged telling Petitioner to refer police questions to Aney or Hobika. (SH at 37).

Wason thereafter re-contacted Hobika to explain that he would be subpoenaed as a <u>Huntley</u> hearing witness.  Wason stated that Hobika became angry, said that he would hurt Petitioner's case if called to testify, and threatened to deny representing Petitioner. (SH at 37-38). Hobika denied ever speaking with Petitioner about the murders and disputed Wason's testimony concerning their telephone conversations. (SH at 103-104, 119-120). Having observed the testimony of the witnesses, this Court finds Wason's testimony on this point vastly more credible than Hobika's denials.

With regard to the post-arrest period, Hobika admitted that he accompanied Matthew Cuda to the grand jury proceedings held on March 17, 1994.  Hobika then denied that he was acting as Cuda's attorney, offering the ludicrous explanation that he attended "for basically moral support" and as a personal "learning experience." (SH at 110-112, 129).  In addition to being inconsistent with common sense, this claim is contradicted by Matthew Cuda, who testified that Hobika represented him in connection with the grand jury (SH at 370-71, 375).  Although he certainly has a checkered record, Cuda's testimony on this and other points was highly credible. Moreover, Hobika's credibility is suspect in light of his conviction for criminal solicitation in the fourth degree and suspension from the practice of law due to his involvement with a scheme to present false testimony at a workers' compensation hearing. (SH at 137).

Attorney Aney acknowledged entering a general appearance as Petitioner's attorney on March 16, 1994. (SH at 205-206).  Aney also testified that he met with Petitioner in jail later that evening to discuss the case, wherein Aney advised Petitioner not to testify before the grand jury. (SH at 223-25). Aney then admitted being present at the courthouse the next day, when Crocilla and Cuda testified before the grand jury - his attendance having been

arranged at the request of Crocilla.  (SH at 210, 255).  Aney testified that he spoke with the Assistant District Attorney about immunity for Crocilla. (SH at 212, 231, 256).  Aney said he did not "recall" whether he had discussed immunity for Cuda. (SH at 231).  Aney told the Assistant District Attorney that he was not representing Petitioner and in fact had "never" represented Petitioner. (SH at 212, 215, 217).

In his Sparman testimony, Aney testified that he never represented Petitioner. (SH at 219).  He further suggested that, although he was present in the courthouse during the grand jury proceedings and discussed immunity for Crocilla with the prosecutor, he was not acting as an attorney for either Crocilla or Cuda. (SH at 200-01, 217, 255-56).  Further, Aney testified that he did not represent *anyone* in connection with this case (SH at 217)("I really represent nobody"), notwithstanding the fact that he appeared at a court proceeding on behalf of Petitioner (and discussed making a bail application on his behalf), visited Petitioner in jail to discuss the case (and advised Petitioner not to testify before the grand jury), and discussed immunity with the prosecutor on behalf of Crocilla.

Aney's preposterous claims were contradicted by Attorney Hobika (who testified that Aney was acting as the attorney for Crocilla and Cuda - SH at 112, 114-16), Crocillia (who testified that Aney was acting as his attorney - SH at 625), and Cuda (who testified that Aney was acting as Crocilla's attorney - SH at 375).  The claim that Aney never represented Petitioner is obliterated by the undisputed facts - Aney made a general appearance on Petitioner's behalf at a court proceeding, indicated he would a prepare bail application on his behalf, discussed the facts of the case during a jailhouse visit, and advised Petitioner not to testify before the grand jury.

In addition and most importantly, Judge Michael Dwyer (who prosecuted the case

and handled the grand jury proceedings) testified that Aney and Hobika accompanied Crocilla and Cuda to a meeting at the District Attorney's Office on the day of the grand jury proceedings, that he discussed the possibility of immunity for Crocilla and Cuda with Aney, and that he advised Aney of the inherent conflict created by the fact that Aney had appeared the day before on behalf of Petitioner and was now representing potential prosecution witnesses. (SH at 146-49, 153-54).

Accordingly, the overwhelming weight of the evidence presented at the Sparman hearing leads to the conclusion that Attorneys Hobika and Aney simultaneously represented Petitioner and prosecution witnesses during critical phases of the proceedings. It is likewise apparent to this Court that Hobika and Aney were untruthful in their Sparman testimony.

Having made these findings, three critical observations are necessary. First, as discussed at length above, Pinholster constrains the scope of this Court's review, foreclosing consideration of the compelling evidence presented at the Sparman hearing. This Court's review has thus been limited to the record presented before the state courts and, for the reasons outlined above, this Court finds that Petitioner has not established that the state courts' adjudication of this particular claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or resulted in a decision that was based on an unreasonable determination of the facts *in light of the evidence presented in the State court proceeding.*" 28 U.S.C. § 2254(d)(emphasis added).

Second, for the reasons set forth *supra*, even if this Court was permitted to consider the Sparman evidence and conclude that Aney and Hobika represented Petitioner while burdened by an actual conflict of interest during the post-arrest, pre-indictment period,

45

Petitioner cannot establish the requisite "adverse effects" to warrant habeas relief.

Third, violations of the Code of Professional Responsibility by Attorney Aney and Hobika are not equivalent to violations of the constitutional right to effective assistance of counsel. In other words, Aney and Hobika may have acted unethically, even though their ethical lapses did not "adversely affect" their representation of Petitioner sufficient to warrant habeas relief. The ethical duties imposed upon attorneys at law are much greater than the limited scope of conduct that constitutes the ineffective assistance of counsel. See Nix v. Whiteside, 475 U.S. 157, 165, 106 S.Ct. 988, 89 L.Ed.2d 123 (1986) ("[B]reach of an ethical standard does not necessarily make out a denial of the Sixth Amendment guarantee of assistance of counsel"); Mickens v. Taylor, 535 U.S. 162, 176, 122 S.Ct. 1237, 1246 (2002)("This is not to suggest that one ethical duty is more or less important than another. The purpose of our . . . exceptions from the ordinary requirements of Strickland, however, is not to enforce the Canons of Legal Ethics, but to apply needed prophylaxis in situations where Strickland itself is evidently inadequate to assure vindication of the defendant's Sixth Amendment right to counsel.").

Accordingly, this Court is constrained by the applicable law to find that Petitioner is not entitled to habeas relief and to recommend denial of his ineffective assistance claim on that basis. However, this Court hereby directs the Clerk of the Court to provide a copy of this Report and Recommendation and the Sparman hearing transcript to the Chief Judge of the Northern District of New York for review pursuant to Rule 83.4 of the Local Rules of Practice and referral to the Attorney Grievance Committee of the Appellate Division, Fourth Department. It appears both Attorneys Aney and Hobika are admitted to practice in the Northern District of New York.

46

This Court recommends and urges the Chief Judge to institute and pursue proceedings to investigate and address evident lapses in professional responsibility and potential criminal conduct on the part of Attorneys Aney and Hobika (including, but not limited to, whether Aney and/or Hobika simultaneously represented Petitioner and prosecution witness and whether the testimony offered before this Court at the Sparman hearing was knowingly false).

### 2.    Ineffective Assistance (Kenneth Ray)

The second major aspect of Petitioner's ineffective assistance of counsel claim relates to the performance of Kenneth Ray, his trial counsel.  In sum, Petitioner alleges that Ray knew of the Hobika/Aney conflict issue and should have moved on that basis to quash the indictment and, further, that Ray should have more effectively established the Hobika/Aney conflict in support of his efforts to suppress Petitioner's pre-arrest statements.

### a.    State Court Determination

Petitioner did not assert an ineffective assistance claim with respect to Attorney Ray on direct appeal. (Exhibit A).  The claim was first advanced in support of Petitioner's first 440 motion. (Exhibit G).  However, the County Court's decision denying the 440 motion makes no reference to the Ray ineffective assistance claim. (Exhibit H).  The Appellate Division denied Petitioner's motion for leave to appeal from the County Court's decision without opinion. (Exhibit J).

As discussed above, the County Court did address the Aney/Hobika conflict claim itself, denying the claim on the procedural, state law ground that the claim had been determined on direct appeal and could not, therefore, be re-litigated.

47

The Ray ineffective assistance claim, which was not raised on direct appeal, could not have been denied on that basis.  As such, one would reasonably expect it to have been given separate consideration.   This raises the question of whether the Attorney Ray ineffective assistance claim was "adjudicated on the merits" by the state court.

The answer to this question is potentially significant because a claim raised but not adjudicated on the merits by the state courts is given *de novo* habeas review (as opposed to the highly deferential review required under AEDPA), Brown, 283 F.3d at 498. In addition, Pinholster would not bar consideration of the Sparman hearing evidence regarding the claim. See Pinholster, 131 S.Ct. at 1400-01(limiting application to claims adjudicated on the merits by the state courts).

As discussed above, in the Second Circuit, "to qualify as an adjudication 'on the merits,' a state court decision need not mention a particular argument or explain the reasons for rejecting it." Dallio v. Spitzer, 343 F.3d 553, 560 (2d Cir. 2003)(quoting Brown v. Artuz, 283 F.3d 492, 498 (2d Cir.2002); and citing Aparicio v. Artuz, 269 F.3d 78, 93-94 (2d Cir.2001); Sellan v. Kuhlman, 261 F.3d 303, 312 (2d Cir.2001)).

Where, "'there is no basis either in the history of the case or the opinion of the Appellate Division for believing' that the claim at issue 'was denied on procedural or any other nonsubstantive grounds,' a terse statement that 'remaining contentions are without merit' suffices to trigger AEDPA's heightened standard of review." Dallio, 343 F.3d at 560 (quoting Brown, 283 F.3d at 498).

In a recent decision, the Supreme Court held that "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law

procedural principles to the contrary." <u>Harrington v. Richter</u>, 131 S.Ct. 770, 784-85 (2011). "The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely." <u>Id.</u> at 785.

In the present case, the County Court concluded its decision denying Petitioner's first 440 motion as follows: "In light of the findings herein, pursuant to Sections 440.10 and 440.30 of the Criminal Procedure Law, the Defendant's motion is in all respects denied." (Exhibit H, at p. 5).

The County Court's language suggests four possibilities concerning the Ray ineffective assistance claim: (1) the County Court overlooked the claim; (2) County Court (erroneously) believed the claim had been raised and decided on direct appeal and rejected it on that basis; (3) County Court reviewed the claim, deemed it lacking in merit and not worthy of discussion, and rejected the claim on the merits when it denied the motion "in all respects;" or (4) County Court considered the claim procedurally barred by CPL 440.10 (2)(c) (which provides for the denial of claims the defendant could have raised on direct appeal, but unjustifiably failed to) and denied the claim on that procedural basis without saying so explicitly.

A careful review of the County Court's decision strongly indicates that the first two possibilities (*i.e.* that County Court overlooked the Ray claim or incorrectly thought the claim had been litigated on direct appeal) are more likely than the latter two options.  In denying the motion "in all respects," the County Court related its decision back to "the findings herein."[18] This suggests the court believed it had addressed all of the claims raised and

---

[18]When the statutory references are removed, the sentence in question reads "In light of the findings herein ... the Defendant's motion is in all respects denied." (Exhibit H).

articulated its reasons for rejecting them in its "findings."  This is unlike, for example, a summary denial in which the court rejects the defendant's "*remaining* contentions," which indicates that the court is summarily disposing of claims not otherwise discussed in its decision.[19]  The County Court's reference back to "the findings herein" suggests it believed (incorrectly) that it had addressed the Ray claim.  As such, this Court tends toward the view that the Ray ineffective assistance claim was not adjudicated on the merits by the state courts and may thus be considered *de novo* on habeas review.  However, out of an abundance of caution, this Court will review the claim under both the deferential AEDPA standard and *de novo*.  For the reasons outlined below, Petitioner is not entitled to relief under either standard.

### b.      Review of Ray Ineffective Assistance Claim

Ineffective assistance claims are generally evaluated under the test set forth in Strickland v. Washington, 466 U.S. at 686, and recently reaffirmed in Pinholster, 131 S.Ct. at 1403.  Under that test, "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct *so undermined* the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Pinholster, 131 S.Ct. 1403 (emphasis original)(quoting Strickland, 466 U.S. at 686).

Because "the 'tempt[ation] for a defendant to second-guess counsel's assistance

---

[19]Respondent urges this Court to adopt the following chain of reasoning: The Appellate Division rejected Petitioner's claim of ineffective assistance as it related to Aney and Hobika.  The ineffective assistance claim against Attorney Ray is necessarily dependent upon a finding that Aney and Hobika were ineffective.  Therefore, the County Court, being aware of the Appellate Division's ruling, implicitly found that the Ray claim was without merit.  This argument is unsound.  First, as will be made apparent in the discussion following, the Ray claim was not necessarily dependent upon a finding of ineffective assistance with regard to Aney and Hobika.  Second, as explained above, a review of the County Court's 440 decision undermines the suggestion that County Court intended to reject any claims it had not specifically discussed.

after conviction or adverse sentence,' . . . counsel should be 'strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment . . . .'" Id. (quoting Strickland, 466 U.S. at 690).

"To overcome that presumption, a defendant must show that counsel failed to act 'reasonabl[y] considering all the circumstances.'" Id. (quoting Strickland, 466 U.S. at 688). "The Court cautioned that '[t]he availability of intrusive post-trial inquiry into attorney performance or of detailed guidelines for its evaluation would encourage the proliferation of ineffectiveness challenges.'" Id. (quoting Strickland, 466 U.S. at 690).

In addition, to prevail on an ineffective assistance claim under Strickland, the defendant must establish prejudice.  In particular, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. (quoting Strickland, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. "That requires a 'substantial,' not just 'conceivable,' likelihood of a different result." Id. (quoting Richter, 131 S.Ct. at 791).

In the present case, Petitioner asserts that Attorney Ray was ineffective for the following reasons: he should have more effectively addressed the Aney/Hobika conflict issue in connection with the Huntley hearing, he should have alerted the trial court to the conflict of interest, and he should have used the conflict of interest to prevent the trial testimony of Pugliese and Crocilla.  This Court will consider each argument in turn.

### i.   Huntley Hearing

As discussed above, Attorney Ray filed a pre-trial motion to suppress incriminating pre-arrest statements made by Petitioner pursuant to People v. Huntley, 255 N.Y.S.2d 838

(1965), on the grounds that the statements were taken while Petitioner was represented by counsel.

Petitioner claimed that he was represented by Attorneys Aney and Hobika during this period and that he repeatedly invoked his right to counsel while interacting with the police and David Benner (who acted undercover as an agent of the police).  The trial court denied Petitioner's motion because he found, *inter alia*, that Petitioner was not represented by counsel during the pre-arrest period.  (PE #18).

In the course of rendering that decision, the trial court opined as follows: "Defendant could have easily met this burden by subpoenaing either Attorney Aney or Attorney Hobika to establish the attorney-client relationship, but defendant failed to do so." (PE #18, at p. 6). Petitioner contends that Ray's failure to subpoena Aney or Hobika as witnesses at the Huntley hearing fell below an objective standard of reasonableness and amounted to ineffective assistance of counsel.  This Court finds Petitioner's argument unavailing under either *de novo* or AEDPA review.

Although the trial court indicated that Petitioner could have met his burden of proof by subpoenaing Aney and/or Hobika, that is true only if the attorneys were subpoenaed *and* testified that they did, in fact, represent Petitioner during the pre-arrest period.  Attorney Ray could quite reasonably have feared that Aney and/or Hobika would deny the representation, thereby seriously damaging the prospects of Petitioner's suppression motion.  If Aney and Hobika had made such denials, the trial court could not have granted the motion without concluding that the attorneys were lying, an outcome Ray could reasonably have believed

was unlikely.[20]

Consideration of the Sparman hearing testimony lends further credence to the view that Attorney Ray's decision not to subpoena Aney and/or Hobika was a strategic choice, which is "virtually unchallengeable" in habeas corpus proceedings. See Strickland, 466 U.S. at 690-91.

Before discussing the Sparman hearing testimony, however, consideration of Attorney Ray's Sparman affirmation is necessary.  Attorney Ray was unable to testify at the Sparman hearing due to a terminal illness.[21]  In lieu of his testimony, Respondent submitted an affirmation from Attorney Ray dated September 8, 2008. (Docket No. 82-2).

In his affirmation, Ray stated that he was "fully familiar with the facts of the case" and that, to his "knowledge," Hobika "did not handle felony criminal matters" and never represented Petitioner in the case. (Docket No. 82-2, at ¶ 3, 4). Ray further stated his belief that Aney's representation was limited to a single pre-indictment court appearance. (Docket No. 82-2, at ¶ 5).

These statements are curious (to say the least) among many curiosities in this case in that the pre-trial suppression motion, which was *brought by Attorney Ray*, was based upon the allegation that Hobika and Aney represented Petitioner during the pre-arrest period.  Moreover, Ray clearly had "knowledge" that Hobika and Aney represented

---

[20]The fact that this Court has concluded, after hearing the Sparman evidence, that Hobika represented Petitioner during the pre-arrest period does not make Attorney Ray's strategic judgment in this regard retroactively unreasonable.  The question is not whether it would have been impossible for Ray to convince the trial court that Aney and Hobika were lying, but whether it was objectively reasonable for Ray to be concerned that he could not.  Under the circumstances, Ray's belief in that regard falls well within the realm of reasonableness.

[21]Attorney Ray passed away only days after the hearing was completed.

Petitioner during that period.   During the <u>Huntley</u> hearing, *upon questioning by Ray*, Petitioner testified that he told the police he was represented by Aney and Hobika. (T at 755a).  On cross-examination, with Ray present in the courtroom, Petitioner testified that he contacted Hobika regarding the murder investigation and considered Hobika retained as his attorney in that regard. (T at 797a-798a).

These facts simply cannot be reconciled with the statements in Attorney Ray's September 2008 affirmation.  In the Court's view, Ray's affirmation was untruthful.  The affirmation's glaring inconsistency leads to the following conclusion: either Ray's memory of the events in question was impacted by age and/or illness[22] or someone other than Ray was the source of the information contained in the affirmation.

Indeed, at the <u>Sparman</u> hearing, the Assistant Attorney General advised that she prepared the affirmation after speaking with Judge Dwyer (who prosecuted the case against Petitioner) about a conversation Judge Dwyer said he had with Ray concerning the case. (SH at 599-600).  It is apparent from her representations that the Assistant Attorney General used Judge Dwyer's statements about his conversation with Ray as the sole source of the content of the affidavit. (SH at 601). It is also clear that the Assistant Attorney General did not obtain the facts contained in the affidavit in any preparation session with Attorney Ray. (SH at 599-600). Rather, the Assistant Attorney General presented Ray's affidavit to the court, after obtaining the signature of the affiant under seriously questionable circumstances, given Ray's incapacity. (SH at 601). The Assistant Attorney General

---

[22]The court attempted to speak with Attorney Ray by telephone and was given the impression that it was not possible because he was incoherent and too ill. (SH at 604).  As noted above, Ray passed away in early October 2008, approximately two weeks after the <u>Sparman</u> hearing concluded. (Docket No. 78).

prepared an affirmation based upon what Judge Dwyer said Ray said and then offered a signed copy of that affirmation as evidence to this Court. (SH at 599-602).[23]  In any event, this Court affords no weight whatsoever to Attorney Ray's September 2008 affirmation.[24]

In contrast, the <u>Sparman</u> hearing testimony of Ray's associate, Charles Wason, is credible and offers insight into Ray's strategic decision-making with regard to the <u>Huntley</u> hearing.  Wason testified that it was his understanding that Petitioner was represented by Hobika during the pre-arrest period, that Hobika told Petitioner to refer any law enforcement inquires to him or George Aney, but that Aney was "more of just a name," rather than someone with whom Petitioner had an attorney-client relationship. (SH at 35).

As discussed above, Wason testified that he spoke with Hobika on the telephone prior to the <u>Huntley</u> hearing and that Hobika confirmed that he had represented Petitioner

---

[23] The court is also troubled by the Assistant Attorney General's unreserved use of the testimony of Attorneys Aney and Hobika as well as the creation and use of the Ray affirmation. <u>Geders v. United States</u>, 425 U.S. 80, 96 S.Ct. 1330 (1976) ("An attorney must respect the important ethical distinction between discussing testimony and seeking improperly to influence it. Ethical Consideration 7-26 of the American Bar Association Code of Professional Responsibility (1975) states:"The law and Disciplinary Rules prohibit the use of fraudulent, false, or perjured testimony or evidence. A lawyer who knowingly participates in introduction of such testimony or evidence is subject to discipline. A lawyer should, however, present any admissible evidence his client desires to have presented unless he knows, or from facts within his knowledge should know, that such testimony or evidence is false, fraudulent, or perjured."Disciplinary Rule 7-102 of the Code provides in relevant part:"(A) In his representation of a client, a lawyer shall not:"(6) Participate in the creation or preservation of evidence when he knows or it is obvious that the evidence is false."(7) Counsel or assist his client in conduct that the lawyer knows to be illegal or fraudulent."(8) Knowingly engage in other illegal conduct or conduct contrary to a Disciplinary Rule."Any violation of these strictures would constitute a most serious breach of the attorney's duty to the court, to be treated accordingly. . .").

[24] As outlined above, Attorney Ray's affirmation is demonstrably false to the extent it claims Ray had "no knowledge" of Hobika's representation of Petitioner during the pre-arrest period. Ray clearly had such knowledge and engaged in vigorous pre-trial litigation (including a multi-day <u>Huntley</u> hearing) based upon the premise that Hobika represented Petitioner throughout that period.  An investigation of the circumstances under which that affirmation was executed would shed light on why Ray's memory became faulty in a manner perfectly coincident with the version of events proffered by Hobika at the <u>Sparman</u> hearing.

and had advised Petitioner to refer law enforcement questions to Aney or Hobika. (SH at 36-37).  Wason then had a subsequent conversation with Hobika, in which Hobika stated that he would deny any representation of Petitioner in connection with the murders and would "hurt" Petitioner's defense if subpoenaed to testify at the Huntley hearing. (SH at 37). Wason conveyed this information to Attorney Ray. (SH at 37-38).  Wason and Ray discussed the conversation and Ray made the decision not to call Hobika as a witness. (SH at 40).

Under the circumstances, this Court cannot conclude that Ray's decision not to call Hobika was objectively unreasonable.  Ray could have concluded that Hobika would deny representing Petitioner (a likely outcome given his statement to Wason) and that the trial court would credit Hobika's denial even if Wason was permitted to contradict the denial via rebuttal testimony.  In other words, Ray appears to have been concerned that a denial by Hobika would operate as a "trump card," obviating all other evidence in the eyes of the court.  As such, Ray elected to rely on other evidence to establish Hobika's representation (e.g. the testimony of Petitioner and David Benner), rather than undertaking the risk of calling Hobika and inviting a credibility contest between Hobika and Wason.[25]

Regarding Attorney Aney, Wason testified that it was his understanding that George Aney was "just a name" to Petitioner during the pre-arrest period and that Hobika had given Aney's name to Petitioner to provide to the police, but that Aney and Petitioner had never

---

[25]Attorney Ray's decision not to inform the trial court of the Wason-Hobika conversations does not rise to the level of ineffective assistance of counsel for the same reason.  To wit, it is not clear the trial court would have believed Wason and Ray might reasonably have believed relaying the information would harm Petitioner's defense by clouding the issues and/or damaging counsel's credibility with the court. Again, the question is not whether Ray's decision should be endorsed, lauded, or imitated, but whether it was objectively unreasonable.  For the reasons stated, this Court finds that it was not objectively unreasonable.

met and there was no retainer agreement. (SH at 72, 93).  Wason then explained the

decision not to subpoena Aney to the <u>Huntley</u> hearing as follows:

> Ken [Ray] and I determined when we were strategizing that –
> not to call George Aney, we didn't think he was going to help
> in our defense of [Petitioner] and help create - help
> demonstrate or prove that he had counsel at the time the two
> statements were taken, so we didn't call him.

(SH at 73).  As such, it appears Ray made the strategic choice not to call Aney either

because he believed Aney did not actually represent Petitioner during this time period or

because he surmised that Aney would deny the representation, thereby damaging

Petitioner's credibility and distracting the court from the question of whether Hobika

represented Petitioner, which might well have seemed to be the stronger argument.

Although reasonable defense counsel might disagree as to whether Ray's strategic

choices were correct, they cannot be considered objectively unreasonable. <u>See</u> <u>Skinner</u>

<u>v. Duncan</u>, Nos. 02–CV–3430, 03–MISC–0066, 2003 WL 21386032, at *40 (S.D.N.Y. Jun.

17, 2003) (citing <u>Ryan v. Rivera</u>, No. 00–2153, 21 Fed.Appx. 33, 34 (2d Cir.2001) ("[W]hen

a party challenges matters of trial strategy, such as the decision not to call a witness, even

greater deference is generally warranted: '[A]n appellate court on a cold record should not

second-guess such decisions unless there is no strategic or tactical justification for the

course taken.'") (quoting <u>United States v. Luciano</u>, 158 F.3d 655, 660 (2d Cir.1998)));

<u>see</u> <u>also</u> <u>Pinholster</u>, 131 S.Ct. at 1403 (noting that "[t]here are countless ways to provide

effective assistance in any given case," and that "[e]ven the best criminal defense attorneys

would not defend a particular client in the same way")(quoting <u>Strickland</u>, 466 U.S. at 689).

Accordingly, this Court finds that Petitioner is not entitled to habeas relief as to this claim.

### 2.    Failure to Alert the Trial Court and/or Move to Preclude

Petitioner also contends that Attorney Ray was unconstitutionally ineffective because he (a) failed to alert the trial court to the conflict of interest posed by Attorney Hobika and Attorney Aney's simultaneous representation of prosecution witnesses and (b) did not move to preclude the testimony of the witnesses.  This Court finds Petitioner's claim unavailing for the following reasons.

In order for Ray to have even arguably been ineffective in this regard he would have had to know of the alleged conflicts at the relevant time. To the extent Petitioner's claim is based upon Ray's failure to investigate and discover the conflicts, Ray would need to have had some reason to conduct that investigation.  See Polanco v. United States, Nos. 99 Civ. 5739(CSH), 94 CR. 453(CSH), 2000 WL 1072303, at *10 (S.D.N.Y. Aug. 3, 2000) ("Such undetailed and unsubstantiated assertions that counsel failed to conduct a proper investigation have consistently been held insufficient to satisfy either Strickland prong."); Matura v. United States, 875 F.Supp. 235, 237 (S.D.N.Y.1995) ("Petitioner's bald assertion that counsel should have conducted a more thorough pretrial investigation fails to overcome the presumption that counsel acted reasonably.").

 Although the evidence establishes that Attorney Ray had reason to believe that Hobika represented Petitioner during the pre-arrest period (as discussed above, that alleged representation was one of the grounds asserted in Ray's Huntley motion), there was no evidence presented to the state courts suggesting that Attorney Ray knew or had reason to know that Attorney Hobika represented prosecution witnesses at any time relevant to the case, which is fatal to the claim under AEDPA review.[26]

---

[26]Although the grand jury minutes were turned over to Ray shortly before trial, the minutes do not reference the appearances of Hobika and Aney on behalf of Crocilla and Cuda.

In addition, the claim lacks sufficient support even if considered *de novo* with the Sparman evidence.  At the Sparman hearing, Wason testified that he and Ray were aware of Hobika's "social relationship" with Crocilla and Cuda (SH at 30-32, 37), but there was no evidence that Ray knew or reasonably should have known that Hobika represented Crocilla and/or Cuda at the grand jury or at any other time in connection with the case.

For the same reason, Petitioner's argument that Ray should have moved to quash the indictment based upon the Hobika conflict of interest must be rejected because the record lacks evidence to the effect that Ray knew or reasonably should have known about Hobika's simultaneous representation of Petitioner and grand jury witnesses.

Likewise, Petitioner's claim fails as it relates to Attorney Aney.  As a threshold matter, there was no evidence in the state court records that, prior to the start of the trial, Ray knew or had reason to know that Aney represented Crocilla, Cuda, or Pugliese.  As such, the fact that Ray did not advise the trial court of any arguable pre-trial conflict of interest involving Attorney Aney cannot constitute ineffective assistance of counsel.  In like manner, Petitioner's suggestion that Attorney Ray should have sought to quash the indictment due to Aney's simultaneous representation of prosecution witnesses is unavailing because there is no evidence that Ray knew or reasonably should have known that Aney represented grand jury witnesses at the time of the grand jury proceedings.

With that said, Attorney Ray was aware (or reasonably should have been aware) of a potential conflict of interest at trial when Aney appeared on behalf of two prosecution witnesses, Crocilla and Pugliese.  At that point, Ray would have been aware that (a) Aney had represented Petitioner and (b) that Aney was now representing two prosecution witnesses.  Petitioner suggests that Ray should have sought to bar the testimony of these

59

two witnesses on the grounds that he (Petitioner) shared confidences with Aney, which Aney then shared with Crocilla and Pugliese.

However, Petitioner has not satisfied Strickland prejudice prong because he has not demonstrated a substantial likelihood that Attorney Ray would have succeeded with an attempt to bar the testimony of Crocilla or Pugliese.  Petitioner has not provided any legal authority to suggest that Crocilla and/or Pugliese were prohibited from testifying *per se* because they were represented by Petitioner's former counsel.  Rather, it would appear that their testimony would only have been precluded if (a) Petitioner was willing to reveal the confidences he allegedly shared with Aney to the trial court and (b) the trial court was persuaded that the testimony of Crocilla and/or Pugliese was based upon confidences divulged by Aney.

There is insufficient evidence in the state court records to demonstrate a substantial likelihood that either of these conditions would have been satisfied, thereby rendering Petitioner unable to satisfy Strickland's prejudice prong under AEDPA review.  See Strickland, 466 U.S. at 687 (granting relief based upon ineffective assistance of counsel requires "a showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable," and that "but for" the claimed errors of counsel, the trial result would have been different").  To wit, as discussed below, there is a strong likelihood that Petitioner would not have disclosed the confidences to the trial court and that, even if he did, the trial court would have concluded that the testimony of Crocilla and Pugliese was based upon their personal knowledge, rather than information improperly obtained from Attorney Aney.

Petitioner's claim is not materially improved by consideration of the Sparman

60

evidence.   Petitioner was *extremely* reluctant to disclose the confidences he allegedly shared with Aney to this Court.   Indeed, Petitioner's counsel moved unsuccessfully to preclude any mention of those confidences during Petitioner's <u>Sparman</u> testimony on the grounds that Petitioner did not wish to incriminate himself. (SH at 483-487).   This strongly indicates that Petitioner would not have been willing to disclose the confidences to the trial court even if Attorney Ray had urged him to do so.   Petitioner's reluctance to disclose the confidences after being convicted of the murders would only have been heightened before the conviction.

Moreover, Petitioner has not established a substantial likelihood that the trial court would have found that the testimony of Crocilla and/or Pugliese was based upon the alleged confidences even if (a) Attorney Ray had advanced such an argument and (b) Petitioner had disclosed the confidences to the trial court. <u>See</u> <u>Harrington</u>, 131 S.Ct. at 792 (holding that, under <u>Strickland</u>, the "likelihood of a different result must be substantial, not just conceivable").

Crocilla testified at trial that Petitioner told him that he (Petitioner) had stepped on the neck of one of the victims.   (T at 1130). At the <u>Sparman</u> hearing, Petitioner denied making this admission to Crocilla and testified that, during a private conversation during Aney's jailhouse visit on March 16, 1994, he asked Aney whether "stepping on a neck" could subject him to criminal liability. (SH at 520).   Petitioner suggests that Aney divulged this confidence to Crocilla and was the source of Crocilla's incriminating testimony. (SH at 521).   Crocilla reaffirmed at the <u>Sparman</u> hearing that Petitioner told him directly about stepping on the neck of one of the murder victims. (SH at 624).

Although Crocilla's credibility was generally suspect, his testimony on this point was

61

more credible than Petitioner's.  In an October 2000 affidavit submitted in support of his first 440 motion, Petitioner stated that he "openly discussed the case" with Crocilla during his pre-trial incarceration. (Exhibit G).  Moreover, the testimony established that Crocilla was Petitioner's boss and acted as a mentor and confidante to Petitioner.  When asked at the Sparman hearing whether he had conversations with Crocilla about his involvement in the murders, Petitioner answered "Absolutely." (SH at 521).  Petitioner also testified that he confided in Crocilla about the murders and that he spoke about the case prior to his arrest while both Aney and Crocilla were present. (SH at 496, 499).  Accordingly, this Court finds that, even upon consideration of the Sparman evidence, Petitioner has not established a substantial likelihood  (a) that Aney was the source of Crocilla's testimony and (b) that the trial court would have precluded Crocilla from testifying on that basis if Ray had raised the prior representation issue.

Petitioner has likewise not made the requisite showing regarding the testimony of James Pugliese, another Aney client who testified as a rebuttal witness for the prosecution. Again, this argument hinges upon the assumption that Ray could have successfully moved to preclude Pugliese's testimony by citing the fact that Pugliese was represented by Petitioner's former attorney.  Petitioner has not offered any support for a *per se* rule of exclusion under such circumstances and has also not shown that the trial court would have prevented Pugliese from testifying on the grounds that his testimony was based upon confidences revealed by Aney.  Certainly no such support exists in the state court records, which is fatal to the claim under AEDPA review.

At the Sparman hearing,  Petitioner testified that during the March 16, 1994, jailhouse conference with Aney, he told Aney he was concerned that Pugliese might have

62

overheard a conversation Petitioner had with a third party, in which Petitioner discussed his need for a gun. (SH at 539-40).   Petitioner then suggests that Aney, using this confidence, reached out to the prosecution and/or Pugliese during Petitioner's trial to make them aware that Pugliese might have valuable testimony to offer against Petitioner.  Aney's alleged motivation for this gambit was to gain a favorable disposition for Pugliese, whom he was representing on unrelated drug charges.

This proposition is wholly speculative and, indeed, strains credulity.  Petitioner's argument rests upon the supposition that Aney knew about Pugliese's potentially valuable testimony for nearly a year, but waited until four days *after* the prosecution rested its case-in-chief against Petitioner to offer Pugliese's testimony as a rebuttal witness in exchange for leniency with regard to drug charges filed several months prior.  Pursuing such a strategy would have risked the possibility that the prosecution would decline to call Pugliese (on the grounds that it was confident in the proof already presented) or that the trial court would preclude the testimony as improper rebuttal.

In contrast, Pugliese offered a credible explanation during his trial testimony regarding how he came to be a rebuttal prosecution witness.  After being subpoenaed by Attorney Ray's office as a possible *defense* witness, Pugliese called Aney to tell him that he had potentially valuable information to offer the prosecution. (TT at 1592-93, 1601-03).

Lastly, Petitioner has not established a substantial likelihood that he would have been acquitted even if Ray had successfully precluded the testimony of Crocilla and Pugliese.  Given the overall strength of the prosecution's case (including incriminating statements by Petitioner), it is unlikely the jury would have reached a different result even if it had not heard testimony from Crocilla and/or Pugliese.

Accordingly, this Court finds that, even upon consideration of the <u>Sparman</u> evidence, Petitioner has not established a substantial likelihood that the trial court would have precluded Crocilla or Pugliese from testifying even if Ray had raised the prior representation issue or, in the alternative, that he would have been acquitted if Ray had successfully precluded the testimony of either or both of these witnesses.

However, it should be noted that while Petitioner has not established that the testimony of Crocilla and Pugliese was based upon improperly disclosed client confidences, there may have nevertheless been a violation of professional responsibility by Attorney Aney. <u>See</u> Disciplinary Rule 5-108 of the New York Code of Professional Responsibility. ("[A] lawyer who has represented a client in a matter shall not, without the consent of the former client after full disclosure . . . [t]hereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client.").[27]

In this case, there is no question that Attorney Aney appeared as Petitioner's attorney and thereafter represented at least two prosecution witnesses who provided testimony materially adverse to Petitioner's interests.  Moreover, Aney himself admitted discussing grand jury immunity for Crocilla with the prosecutor just hours after he appeared on Petitioner's behalf at a court hearing and held a jailhouse conference with Petitioner. This Court *strongly* recommends that this issue be considered by the District Judge in connection with proceedings pursuant to Rule 83.4 of the Local Rules of Practice.

Petitioner also suggests that he is entitled to habeas relief because the trial court

---

[27]In April of 2009, New York adopted new Rules of Professional Conduct.  Rule 1.9 is substantially the same as DR 5-108.

and District Attorney failed to comply with their independent duties to investigate and address potential conflicts of interest.  This argument likewise lacks merit.  There is insufficient evidence that the trial court knew or had reason to know of any potential conflict of interest.  This is particularly so, given the trial court's <u>Huntley</u> hearing finding that Petitioner was not represented by Aney or Hobika during the pre-arrest period.  Moreover, as discussed above, even if the trial court had inquired, Petitioner has not shown a substantial likelihood that the indictment would have been quashed, that the testimony of Crocilla and/or Pugliese would (or should) have been precluded, or that the conflict bore "a substantial relation to the conduct of his defense." <u>People v. Conte</u>, 71 A.D.3d 1448, 1449, 896 N.Y.S.2d 770, 772 (4th Dep't 2010)("Although the court failed to conduct that inquiry, we nevertheless conclude that defendant was not denied effective assistance of counsel based on defense counsel's failure to move to withdraw. Defendant has failed to establish that the conflict of interest arising from the prior representation 'affected, ... operated on, or [bore] a substantial relation to the conduct of the defense.'")(citations omitted).

With regard to the claim that the District Attorney should have brought the alleged conflict of interest to the trial court's attention, this claim was raised for the first time in Petitioner's <u>Sparman</u> hearing summation.[28]  The claim is thus time-barred and not properly before this Court.  Further, even if this Court was inclined to review the claim on the merits and to conclude that the District Attorney should have brought the conflict issue to the trial court's attention, Petitioner has not shown a substantial likelihood that the outcome of the

---

[28]Petitioner appears to acknowledge this fact by including a footnote requesting, in summary fashion, leave to amend the Petition pursuant to Rule 15 of the Federal Rules of Civil Procedure.

trial would have been different but for the District Attorney's inaction.  In other words, Petitioner has not shown a substantial likelihood that the indictment would have been dismissed, that the testimony would have been precluded if the conflict issue had been raised, or that he would have been acquitted if Crocilla and Pugliese had been barred from testifying.  Petitioner has thus not established the requisite prejudice arising from the District Attorney's arguable violation of his disclosure duty.  See People v. Harris, 288 A.D.2d 610, 614, 732 N.Y.S.2d 664, 668 (3d Dep't 2001) aff'd, 99 N.Y.2d 202, 783 N.E.2d 502 (2002)("We also are mindful, however, that the District Attorney, like defense counsel, is under a mandatory affirmative obligation both to recognize the existence of a potential conflict and to alert the court to the facts and circumstances surrounding that potential conflict. . . . While we find inexcusable the District Attorney's failure to bring to light this overlapping representation, we find that it neither affected Albanese's pretrial representation of Harris nor the ultimate trial representation of Harris.")(internal citations omitted).

For the foregoing reasons, this Court finds that Petitioner has not satisfied the Strickland standard with respect to his ineffective assistance claim concerning Attorney Ray.  This result obtains whether the claim is reviewed with AEDPA deference and limited to the evidence produced in the state courts or *de novo* and with consideration to the evidence presented at the Sparman hearing.  Accordingly, Petitioner is not entitled to habeas relief with regard to this claim.

C.    **Ground Two – <u>Brady</u>**

Petitioner's second ground for habeas relief alleges that the prosecution withheld crucial exculpatory and impeachment evidence, in violation of its disclosure obligation pursuant to <u>Brady v. Maryland</u>, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215  (1963).

Under <u>Brady v. Maryland</u>, the prosecution is obligated to disclose material evidence that is favorable to the accused.    The Supreme Court has held that "there are three components of a true <u>Brady</u> violation: (1) the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) that evidence must have been suppressed by the State, either willfully or inadvertently; and (3) prejudice must have ensued." <u>Id.</u>; <u>see</u> <u>also</u> <u>Boyette v. Lefevre</u>, 246 F.3d 76, 89 (2d Cir.2001).

Petitioner's argument in this regard may be divided into two general categories: (a) information and evidence concerning David Benner and (b) information and evidence concerning a third party suspect.  This Court will address each category in turn.

1.    **Disclosure Regarding David Benner**

David Benner, Petitioner's accomplice, cooperated with the police prior to Petitioner's arrest and provided highly damaging trial testimony against Petitioner.  In support of his <u>Brady</u> claim, Petitioner argues that the prosecution withheld notes from Benner's interviews with the police.  In sum, Petitioner suggests that it is implausible to believe, as the prosecution contended, that no notes were taken, given the large number of meetings between Benner and the prosecution.

This claim was raised on direct appeal. (Exhibit A, at p. 67).  The Appellate Division rejected the argument, finding "no merit to the contentions that the People failed to disclose <u>Brady</u> material . . . ." <u>Pepe</u>, 689 N.Y.S. 2d at 312.  Petitioner has not established that this

ruling resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Other than the speculation that notes of the Benner interviews would likely have been taken under the circumstances, Petitioner offered no proof to the Appellate Division that the notes actually existed and/or were withheld by the prosecution. Speculation is insufficient to warrant the extraordinary remedy of habeas relief. See Mallet v. Miller, 432 F. Supp.2d 366, 377 (S.D.N.Y. 2006) ("[T]he mere speculation that exculpatory evidence was withheld is insufficient to warrant habeas relief.") (citing Strickler v. Greene, 527 U.S. 263, 286, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999).

Petitioner also contends that the prosecution violated its Brady obligation by failing to disclose the results of a polygraph test performed on Benner.  This argument is without merit as a matter of clearly-established law. See Wood v. Bartholomew, 516 U.S. 1, 6, 116 S. Ct. 7, 10, 133 L. Ed. 2d 1 (1995)("The information at issue here, then-the results of a polygraph examination of one of the witnesses-is not 'evidence' at all. Disclosure of the polygraph results, then, could have had no direct effect on the outcome of trial, because respondent could have made no mention of them either during argument or while questioning witnesses.").

Lastly, Petitioner suggests possible manipulation of Benner's arrest record.  As discussed above, Benner cooperated with the police and facilitated the March 11, 1994 recording of a conversation with Petitioner, in which Petitioner made incriminating statements (*e.g.* he admitted burning evidence and reminded Benner that the shooting was

"just business").  According to Benner, his cooperation with the police was voluntary and he was not arrested for the murders until March 15, 1994 (*i.e.* after he recorded the conversation with Petitioner).  (TT at 585).  The arrest report is consistent with Benner's testimony as to the date of the arrest.  However, Petitioner argues that the arrest report was intentionally altered to change the actual date of arrest (March 7th) to March 15th, to cover up the fact that Benner was under arrest when he recorded Petitoner.  This argument was advanced in support of Petitioner's second 440 motion and was rejected by the County Court. (Exhibit L).

The County Court cited CPL § 440.30 (4)(b) in support of its decision and noted that Petitioner's claim was supported only by "counsel's conclusory assertion that the arrest report had been intentionally altered to conceal the true arrest date of the witness . . . ."  Section 440.30 (4)(b) of the New York Criminal Procedure Law gives the trial court discretion to deny 440 relief when the motion is "based upon the existence or occurrence of facts and the moving papers do not contain sworn allegations substantiating or tending to substantiate all the essential facts."

There is a split of authority within the Second Circuit as to whether denial of a motion pursuant to CPL § 440.30(4) is an "independent and adequate" state procedural bar to federal habeas corpus review. Compare Williams v. McGinnis, No. 04-CV-1005, 2006 WL 1317041, at *10 (E.D.N.Y. May 15, 2006); Marsh v. Ricks, No. 02 Civ. 3449, 2003 WL 145564, at *6-7 & n. 7 (S.D.N.Y. Jan. 17, 2003); Roberts v. Scully, 875 F.Supp. 182, 192-93 n. 9 (S.D.N.Y.1995) (all holding that denial under § 440.30(4)(b) due to inadequacy of petitioner's papers would be an independent and adequate state law ground) with Edwards v. Mazzuca, No. 00 Civ. 2290, 2007 WL 2994449, at *15 (S.D.N.Y. Oct. 15,

2007)(finding that denial pursuant to § 440.30(4)(b) was a decision on the merits subject to habeas review). This Court previously adopted the view that a § 440.30 (4)(b) denial is not a procedural bar. See Gonzalez-Pena v. Herbert, 369 F.Supp.2d 376, 388-89 (W.D.N.Y.2005).

The question of procedural default need not be resolved in this case, however, because Petitioner's claim fails on the merits. The suggestion that the apparent alteration of the arrest report was a deliberate attempt to conceal the true date of Benner's arrest (as opposed to a typographical correction) is wholly speculative and lacking in evidentiary support. Habeas relief cannot be granted on the basis of "unsubstantiated conclusions, opinions, or speculation." Headley v. Ercole, No. 07-CV-979, 2010 WL 3808685, at *8 n.4 (N.D.N.Y. Sep't 22, 2010)(citing Wood, 516 U.S. at 8)(holding that courts should not grant "habeas relief on the basis of little more than speculation with slight support").

### 3.     Disclosure Regarding Third Party Suspect

An October 1993 report prepared by Cayuga County Deputy Sheriff John Lamphere contains the following information: on October 7, 1993, at approximately 9:34 in the evening, Deputy Lamphere received a telephone call from Michael Yarema, a former student. Yarema advised that he had learned of a double homicide in Utica, indicated that he knew John Zajac (one of the victims), and that a friend of Yarema's (identified as "Jason") had information concerning the murder. "Jason" was then placed on the phone and spoke with Lamphere. According to "Jason," he was present at a Utica bar approximately six weeks prior to the murders and observed a confrontation between John Zajac and a drug dealer named Tony "Rosario" ("Jason" was uncertain as to the spelling of "Tony's" last name). According to "Jason," Tony accused Zajac of having an affair with

his wife and told Zajac that he would be in "big trouble" if the affair continued.  Deputy Sheriff Lamphere's report indicates that he advised the Utica Police Department of the foregoing both verbally and in writing. (See Exhibit H to Petition, Docket No. 1).

It is not clear whether any follow-up investigation was conducted by the Utica Police Department or whether the District Attorney's office was apprised of the Lamphere report. In any event, there appears to be no question but that Petitioner and his counsel were not provided with the Lamphere report or any information concerning its contents prior to trial. Petitioner argues that the prosecution had either actual or constructive possession of the Lamphere report and violated its <u>Brady</u> obligations by failing to disclose it.

This claim was raised in Petitioner's second 440 motion and rejected by the County Court. (Exhibit L).  In a detailed ruling, the County Court explained that any non-disclosure concerning the Lamphere report was harmless error because the evidence of possible third-party culpability was too remote and speculative to have been admissible at trial in any event. (Exhibit L, at p. 5-8).

In sum, the County Court found that the probative value of "Jason's" statement would have been outweighed by the risk of delay, prejudice, and jury confusion.  In addition, the Court noted the strong evidence adduced a trial contradicting any suggestion that a third party committed the murders and persuasively establishing that Petitioner was present at the murder scene and participated in the crime (*e.g.* Petitioner's own statements to the police and Benner concerning the events in questions). (Exhibit L, at p. 5-8).[29]

Petitioner has not established that the state court's ruling resulted in a decision that

---

[29]As discussed above, Petitioner admitted helping to burn the bodies and possessing a gun at the murder scene.  (TT at 930-935).

was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. See  Wade v. Mantello, 333 F.3d 51, 60 (2d Cir. 2003)("That a third party may have borne animus towards the victim, standing alone, does little to establish that the third party committed the crime."); Hughes v. Phillips, 457 F. Supp.2d 343, 360 (S.D.N.Y. 2006)("As the Supreme Court stated, there is never a 'real' Brady violation unless the non-disclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict.")(citing Strickler v. Greene, 527 U.S. 263, 281, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999)).

## D.    Ground Three - Ineffective Assistance (Failure to Investigate)

In his third and final ground, Petitioner argues that Attorney Ray was ineffective for failing to investigate certain forensic irregularities involving the testimony of David Benner. Specifically, Petitioner argues that (a) Ray should have consulted with a crime scene reconstruction expert and (b) that, if Ray had done so, he could have provided the jury with an expert opinion to the effect that Benner's testimony concerning the sequence of events was physically impossible.

At trial, Benner testified that he traveled with Petitioner to the North Utica Dry Cleaners on the night of October 7, 1993.  Benner claimed that he remained in the vehicle upon their arrival at the dry cleaners, reclined in the passenger seat.  (T at 493).  According to Benner, he saw Petitioner open the back door to the dry cleaners and allow two men to enter through the door (one of whom Benner identified as John Zajac). (T at 496-97). Benner testified that as the other men entered the dry cleaners, Petitioner used his left

hand to hold open the door and his right hand to shoot the two men. (T at 497-500).

In October of 2000, Petitioner obtained an affidavit from William Sullivan, who identified himself as the owner of Forensic Consulting Services. (Exhibit I to Docket No. 1). In sum, Sullivan opined that a forensic analysis of the crime scene revealed "significant irregularities" in Benner's testimony.  To wit, according to Sullivan, the exterior lighting and size/location of the door frame made it virtually impossible for Benner to observe what he says he observed from a reclined position in the passenger seat of a parked vehicle. (Id. at ¶ 3-5).

Petitioner raised this argument in support of his first 440 motion. (Exhibit G).  The County Court denied the motion, but did not specifically address this claim. (Exhibit H) Respondent suggests that the court was referring to this claim when it concluded that "CPL 440 motions that rely upon allegations which are speculative or conclusory do not warrant hearings or vacature of conviction." (Exhibit H, at p. 5).  However, Petitioner's claim is neither speculative nor conclusory.  Indeed, it is rather specific and supported by an affidavit from a purported expert.  As such, this Court is not inclined to conclude that the 440 court adjudicated this claim on the merits.  Determination of this question is not necessary, however, because Petitioner's claim fails under either AEDPA or *de novo* scrutiny.

First, Petitioner has not provided any authority for the proposition that Ray's failure to consult with a forensic event reconstruction expert under these circumstances was objectively unreasonable or that the trial court would have permitted Mr. Sullivan (or a like

73

expert) to testify at trial.  Indeed, Mr. Sullivan's affidavit offers opinions on questions of sense perception that are typically within the lay purview of the jury (*e.g.* whether a witness's testimony was credible considering distances and lighting conditions).  "'Where an expert would only marginally assist the jury in its role as fact finder, an attorney's decision not to call an expert is more likely to fall within the bounds of reasonable performance and less likely to prejudice the defendant.'" Massaro v. United States, No. 97 Civ.2971 MGC, 2004 WL 2251679, at *4 (S.D.N.Y. Oct.5, 2004) (quoting United States v. Aliotta, No. 97 Cr. 311, 1998 WL 43015, at *3 (S.D.N.Y. Feb.3, 1998)).

Second, Attorney Ray engaged in extended and effective cross-examination of Benner during the trial. (TT at 585-684).  The cross-examination included questions designed to undermine Benner's credibility based upon the physical conditions and lighting. (TT at 639-651).

Third, Petitioner has not established a substantial likelihood that the jury would have acquitted him even if Ray had successfully offered the testimony of a forensic expert. Indeed, it is quite possible the jury did not believe Benner's rather incredible claim that he remained reclined in the vehicle during the shooting.  A finding that Benner understated his role in the murders would not necessarily lead to an acquittal, particularly given the additional evidence of Petitioner's guilt (including Crocilla's testimony about the disposal of evidence and Petitioner's admissions concerning his actions in connection with the shootings and the cover-up).  The jury quite reasonably could have concluded that Benner was not entirely truthful about his location during the shooting, but that he was nevertheless

74

telling the truth when he testified that Petitioner was the shooter.  For these reasons, this Court finds that Petitioner is not entitled to habeas relief as to this claim.

## IV. CONCLUSION

For the reasons stated above, this Court recommends that Vincent Pepe's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 be denied, and that his petition be dismissed.  As outlined above, the scope of this Court's habeas review was substantially impacted by its interpretation of a very recent Supreme Court decision, Cullen v. Pinholster, 131 S. Ct. 1388, 179 L. Ed. 2d. 557 (2011).[30]  As such, if the District Court adopts this Court's interpretation of that decision and the recommendation that habeas be denied, it is further recommended that a certificate of appealability be issued. See 28 U.S.C. § 2253(c); Banks v. Dretke, 540 U.S. 668, 705–06, 124 S.Ct. 1256, 157 L.Ed.2d 1166 (2004) (holding that "to obtain a certificate of appealability a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'") (quoting Miller–El v. Cockrell, 537 U.S. 322, 327, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003)).

---

[30]For example, credible evidence introduced at the Sparman hearing indicated that Attorney Hobika represented Petitioner during the pre-arrest period, while simultaneously representing other targets of the police investigation.  This conflict of interest might well have warranted habeas corpus relief, but this Court finds that, pursuant to Pinholster, its review is limited to the evidence presented to the state courts. Although this Court believes its conclusion in this regard is amply supported by the language and reasoning of the Supreme Court in Pinholster, because of the recent nature of that decision, it is recommended that a certificate of appealability be granted to facilitate review by the Second Circuit.

This Court also recommends that the Chief Judge institute proceedings in the Norther District of New York pursuant to Rule 83.4 of the Local Rules of Practice and refer this matter to the Appellate Division, Fourth Department concerning possible attorney misconduct on the part of Attorney Joseph Hobika, Jr. and George F. Aney.  While this Court is constrained by the applicable law to find that Petitioner is not entitled to habeas relief and to recommend denial of the Petition on that basis, there is a sufficient evidentiary basis to conclude that Aney and/or Hobika simultaneously represented Petitioner and prosecution witnesses and offered testimony at the <u>Sparman</u> hearing that was knowingly false.  Likewise, there is strong reason to question the circumstances under which Attorney Ray's affirmation was prepared.  Lastly, it appears Attorney Aney may have violated the applicable rules of ethics by representing prosecution witnesses at Petitioner's trial after appearing as Petitioner's counsel, discussing the case with him during a jailhouse visit, and providing him legal advice.

The Clerk of the Court shall provide a copy of the <u>Sparman</u> hearing transcript and this Report and Recommendation to the Chief Judge.

Respectfully submitted,

Victor E. Bianchini
United States Magistrate Judge

76

DATED:        November 28, 2011

              Syracuse, New York

## V. ORDERS

Pursuant to 28 USC §636(b)(1), it is hereby ordered that this Report & Recommendation be filed with the Clerk of the Court and that the Clerk shall send a copy of the Report & Recommendation to all parties.

It is further ordered that the Clerk shall provide a copy of the Sparman hearing transcript and this Report and Recommendation to the Chief Judge for review pursuant to Rule 83.4 of the Local Rules of Practice.

**ANY OBJECTIONS to this Report & Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report & Recommendation in accordance with 28 U.S.C. §636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, as well as NDNY Local Rule 72.1(c).**

**FAILURE TO FILE OBJECTIONS TO THIS REPORT & RECOMMENDATION WITHIN THE SPECIFIED TIME, OR TO REQUEST AN EXTENSION OF TIME TO FILE OBJECTIONS, WAIVES THE RIGHT TO APPEAL ANY SUBSEQUENT ORDER BY THE DISTRICT COURT ADOPTING THE RECOMMENDATIONS CONTAINED HEREIN.**

Thomas v. Arn, 474 U.S. 140 (1985); F.D.I.C. v. Hillcrest Associates, 66 F.3d 566 (2d. Cir. 1995); Wesolak v. Canadair Ltd., 838 F.2d 55 (2d Cir. 1988); see also 28 U.S.C. §636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, and NDNY Local Rule 72.1(c).

Please also note that the District Court, on *de novo* review, will ordinarily refuse to consider arguments, case law and/or evidentiary material which could have been, but was not, presented to the Magistrate Judge in the first instance. See Patterson-Leitch Co. Inc. v. Massachusetts Municipal Wholesale Electric Co., 840 F.2d 985 (1st Cir. 1988).

SO ORDERED.

November 28, 2011

Victor E. Bianchini
United States Magistrate Judge